572 A.2d 604

IN THE MATTER OF STEVEN J. WESTON, AN ATTORNEY AT LAW.

Argued January 29, 1990—Decided April 12, 1990.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Daniel M. Waldman* argued the cause for respondent (*Rudnick, Waldman, Ford, Addonizio & Pappa,* attorneys; *Robert A. Bauer,* on the brief).

PER CURIAM.

This case arises from a report and recommendation of the Disciplinary Review Board (DRB) that respondent be suspended from the practice of law for a period of two years. The recommendation is based on the findings of the Monmouth County District Ethics Committee that respondent had engaged in fraudulent misconduct in that he signed a deed and affidavit of title in the name of a client without authorization and misrepresented to the purchaser's attorney that the documents were in fact genuine. Respondent does not contest the DRB's conclusions that his conduct was unethical and in violation of the Rules of Professional Conduct. Respondent contends that this Court should not follow the Board's recommendation that he be suspended from the practice of law for the two-year period.

## I

This case illustrates "what a tangled web we weave, when first we practice to deceive." Sir Walter Scott, "Marmion," Canto VI, stanza 17 (1808). It results from the attorney's refusal to face the inevitable unraveling of a tangled series of condominium transactions that dodged legal requirements that would have called in a first mortgage.

To his credit, respondent, through his attorney, does not deny the essential facts. As the attorney put it in response to a question on whether he would indicate how he disagreed with the findings of the District Ethics Committee:

I don't think that I necessarily disagree with the findings that they made. In fact, I don't disagree with the findings that they made in terms of the Rule violations. It happened.

Respondent's father, Robert Weston, had acted as financial counsellor to several people who acquired interests in a Belmar, New Jersey condominium unit. These persons acquired the unit as investment property. When the original buyer became dissatisfied with the investment, respondent's father arranged to sell the equity in the unit to another investor, but withheld the conveyance from record to avoid calling in the first mortgage. Unfortunately, Investor Number One (the investors were sometimes husband and wife but we shall refer to them in the singular) was never told this. When Investor Number Two tired of the deal, his interest passed to Investor Number Three, again without a record conveyance. Finally, when Investor Number Three wanted out, the equity was acquired by the respondent's father, who had created the chain of interests.

The father put the condominium unit on the market. A buyer appeared who happened to be a legal secretary employed by a Monmouth County law firm. Initially a standard realtor's contract was prepared listing Robert Weston as seller. Respondent, however, personally notified the buyer's attorney that the original owners, who were still residents of Massachusetts, were the title owners and the contract would have to be amended to properly reflect them as the sellers.

Time appeared to be essential to the buyer, and according to the respondent, at the urging of the buyer's attorney he agreed to sign the contract as a representative of the sellers. He did so in the buyer's presence.

After the closing, the purchaser noticed that the signature on the deed appeared to be the same as that on the contract, which she knew that the respondent-attorney had signed. She asked her employer attorney to request that respondent produce a power of attorney for this signature on the deed.

Here the web could have been disentangled had respondent been more forthright. Rather than admit that he had accommodated the various parties in interest, including his father, respondent insisted that Investor Number One had in fact signed the deed. The troubled buyer engaged a handwriting expert, who soon confirmed the obvious. Respondent had falsely signed the deed, the affidavit of title, and the discharge of the contract between Investors Numbers One and Two. In addition, the name of Investor Number One had been falsely affixed to the check for the closing proceeds that went through respondent's trust account for eventual disbursement to the investors in the chain. To compound the matter, when the corrective deeds were later obtained, respondent had his secretary take the acknowledgment although the investor was in another state.

The chairman of the DRB summarized the status of the case in a colloquy at the DRB hearing:

> Your client has been found guilty of forgery, of misrepresentation of facts, of deceit, of having lied to [the purchaser's attorney] about the signatures of [Investor Number One] in the first instance, of having insisted that they were, in fact, correct signatures and then admitting that they were not correct only after a handwriting expert was retained and paid to prove that they were not. If all of that is admitted, what is there in this case in mitigation?

Respondent insists that there was no benefit. After all, each of the investors was paid what was due. In addition, he asserts a good-faith belief that he was in fact authorized to sign by virtue of the terms of the agreement between Investors Num-

bers Two and Three, which designated respondent as their "attorney-in-fact." Respondent insists that when he executed the closing documents, he believed he was fulfilling that authorization. It is true that each of the investors was paid what was owed, but Investor Number One claimed that he never knew he was still on the first mortgage. And the attorney was really accommodating his client, his father. Respondent explains his actions by pointing to the dilemma he found when confronted, within the hours before the closing, with the realization that his father had not procured deeds and closing documents from the investors. He asserts that this was but one of many similar transactions in which he might be rightly regarded as an attorney-in-fact authorized to close the matters. The Board might well have accepted that as mitigation had not respondent insisted in a letter to the purchaser's attorney that the signatures were genuine. A member of the Board asked respondent to explain:

Could you—could you—I would like to hear from you, placing it in whatever light you feel is most advantageous to the client. The letter reads, it's very short,

"I am very disturbed by your suggestion that the documents—" this is to [the attorney],

"that the documents you received at the closing table may not have contained actual signatures. I am not a handwriting expert, and I have no explanation whatsoever for the apparent discrepancy that you point out."

"Speculation serves no useful purpose."

Please listen to this next sentence particularly carefully.

"The fact remains that my clients did, in fact, execute the closing documents. Title has, in fact, closed. The funds were distributed—disbursed and my clients have asserted no closing—closing claims concerning anything.

"I suggest you record the deed and—and discharge to protect your client's ownership interest in the property."

What explanation, or what justification can you give for all of the apparent misrepresentations or untruths contained in the letter?

[RESPONDENT'S ATTORNEY]: There's no justification for it. The only explanation one can give is that by that time he was so far in over his head for having done what he did on the date of closing that he—he was not going to take it upon himself to unwind that and he obviously thought it was going to go away.

## II

The only question, then, is what is the appropriate measure of discipline in these circumstances. Respondent argues that our precedent suggests a lesser discipline than a two-year suspension, referring to *In re Spagnoli*, 89 *N.J.* 128, 445 *A.*2d 39 (1982), in which a public reprimand was imposed for preparing and filing affidavits that the attorney signed in the name of his clients, and *In re Labendz*, 99 *N.J.* 273, 471 *A.*2d 21 (1984), *In re Mocco*, 75 *N.J.* 313, 381 *A.*2d 1212 (1978), and *In re Shamy*, 73 *N.J.* 187, 373 *A.*2d 655 (1977), in which cases attorneys who misrepresented material facts or executed documents reflecting misrepresentations were suspended for a period of one year.

We note first that in *Spagnoli* the respondent believed that the emergent nature of the marital proceedings warranted that he sign the documents based on information given him by his client. But, more important, we think that this case falls more closely in line with cases in which suspension has been for more than one year. See *In re Chidiac*, 109 *N.J.* 84, 533 *A.*2d 704 (1987) (delivery to bank of forged inheritance tax waiver warranted indefinite suspension pending disposition of other disciplinary matters); *In re Yacavino*, 100 *N.J.* 50, 494 *A.*2d 801 (1985) (forging a judge's name to an adoption order warranted a three-year suspension); *In re McNally*, 81 *N.J.* 304, 406 *A.*2d 1315 (1979) (forging a sheriff's name to a deed of foreclosure resulted in a two-year suspension). In two recent cases we have reaffirmed our insistence on a lawyer's unbending duty to be candid and forthright. When an attorney lies under oath in a judicial proceeding pursued for his own benefit, the conduct "undermines the administration of justice" and merits a long period of suspension. *In re Lunn*, 118 *N.J.* 163, 169, 570 *A.*2d 940 (1990) (three-year suspension). A lack of candor even when "no one was seriously hurt, and the court was not actually misled" may warrant a suspension. *In re Kernan*, 118 *N.J.* 361, 368, 571 *A.*2d 1282 (1990) (three-month suspension).

What sets this case at a more serious level of discipline is respondent's unfortunate act of compounding his own misconduct. It is one thing to panic in the face of the overwhelming pressure of events. It is another thing to tell a fellow attorney that a signature is genuine when it is not. Conveyancing, like so many aspects of the practice of law, depends greatly on mutual trust between lawyers. A lawyer's word must be a bond.

We are satisfied that in the circumstances of this case the discipline recommended is warranted.

In view of the severity of the multiple misrepresentations committed, combined with respondent's failure initially to acknowledge the same, we order that respondent be suspended for a period of two years. Respondent shall reimburse the Ethics Financial Committee for administrative costs. ·

So ordered.

*For suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

It is ORDERED that STEVEN J. WESTON of OCEAN TOWNSHIP, who was admitted to the bar of this State in 1977, be suspended from the practice of law for a period of two years, effective May 1, 1990, and until further Order of this Court; and it is further

ORDERED that STEVEN J. WESTON reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that STEVEN J. WESTON be restrained and enjoined from practicing law during the period of his suspension; and it is further

484

ORDERED that STEVEN J. WESTON comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.