730 A.2d 346

IN THE MATTER OF PATRICK DI MARTINI,
AN ATTORNEY AT LAW.

Argued March 2, 1999—Decided June 11, 1999.

*Nitza I. Blasini,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*John J. Curley,* argued the cause for respondent (*Curley & Sciarra,* attorneys).

PER CURIAM.

This disciplinary action concerns two matters. The first arises out of the purchase and sale of a two-family house in Jersey City. In connection with those transactions, respondent, Patrick DiMartini, is charged with violating the *Rules of Professional Conduct* (*RPC*), sections 1.2 (scope of representation), 1.4 (communication with client), 1.7 (conflict of interest), 1.15 (safekeeping property), and 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). The second matter concerns an incident in which respondent is charged with failing to safeguard client funds, in violation of *RPC* 1.15.

Finding ethics infractions in both matters, the District Ethics Committee (DEC) recommended disbarment. The Disciplinary Review Board (DRB) recommended a two-year suspension.

Our responsibility in attorney disciplinary matters is to conduct an independent review of the record, *R.* 1:20–16(c), and to determine whether the charges have been proved by clear and convincing evidence. On two critical issues, our independent review of this record leads us to different factual conclusions from those of the DRB. Although we find respondent guilty of ethical infractions, we conclude that the appropriate discipline is a three-month suspension.

## I.

Respondent was admitted to the bar in 1958. Until the filing of the complaints in these matters, respondent had not been charged with any ethics infractions.

For approximately a quarter of a century, respondent was the "family attorney" for the Perretta family. The grievant, Krystine Kuty, was married to John Perretta from 1973 until their divorce in 1993. Kuty met Perretta when she worked briefly as a temporary secretary in respondent's office. Respondent served as the best man at Perretta and Kuty's wedding. He visited them as they moved about the nation, and is the godfather to one of their children.

The matter at issue concerns respondent's representation of Kuty, Perretta, and Perretta's sister, Carol Perretta Pollack. On the factual question whether respondent acknowledged a series of forged signatures, the DEC and DRB disagreed. The DEC concluded that respondent's acknowledgment of the signatures on those documents was proper, but the DRB concluded from its review of the record that the signatures were forgeries. Like the DEC, we conclude that Kuty's signatures on the documents were not forged and that respondent did not commit an impropriety in acknowledging the signatures on those documents. Furthermore, unlike both the DEC and DRB, we find that the record falls far

short of establishing clear and convincing proof that respondent attempted to deceive the Internal Revenue Service (IRS).

In 1972, respondent represented Pollack in the purchase of a two-family dwelling for approximately $75,000. Although Pollack was the title owner, she was to hold title "in trust" for Perretta. No documents, however, indicated that Perretta held any ownership interest.

Also in 1972, while Kuty was working as a temporary secretary for respondent, she met Perretta. Perretta and Kuty were married the following year on February 16, 1973.

In March 1988, Perretta and Pollack decided to sell the property to Grace and Zutico Dy. Pollack and her husband transferred title to Kuty, consistent with the original arrangement with Perretta. Respondent testified that the transfer of the property from the Pollacks to the Dys was structured to transfer responsibility for any capital gains taxes from the Pollacks to Perretta, the "true" owner of the property. Thus, respondent designed the transactions so that the Pollacks would realize no profit from the sale of the property and that Perretta and Kuty would incur any capital gain. Because of Perretta's poor credit rating, due in part to the entry of judgments against him, title was placed in Kuty alone, rather than in Kuty and Perretta jointly. Kuty claims that she was unaware of the transaction. Respondent acknowledges that Kuty was not present at the closing. The closing documents stated that Kuty paid approximately $73,000 for the property, about the same amount as Pollack had paid for the property sixteen years earlier. No money actually changed hands.

Respondent represented all parties despite the conflict of interest inherent in representing both sides in a property closing. He neither prepared a written disclosure of the conflict, nor obtained written waivers from any of the parties.

On March 31, 1988, Perretta and Kuty signed a contract to sell the property to the Dys for $170,000. Although Kuty's father apparently witnessed their signatures, Kuty questioned the signa-

ture of her father. No expert testimony corroborated her doubts. At the time of the DEC hearing, Kuty's father was dead. Consequently, the record does not contain his testimony.

In June 1988, Kuty transferred title to Mr. and Mrs. Dy. Kuty testified that she was unaware of that transaction as well, and that she was not present at the closing. She further claims that respondent did not discuss the transactions with her. Respondent acknowledged that he spoke only with Perretta. He assumed that as the husband in an apparently happy marriage, Perretta had implied authority to act for Kuty.

The first major issue at the DEC hearing concerned the validity of Kuty's signature on the contract, deed, and affidavit of title in the Dy transaction. Respondent, who acknowledged the signatures, testified that he never would have done so unless the document was signed in his presence. He further testified that, consistent with his "absolute practice," Kuty signed all documents in his presence. Both respondent and the DEC retained experts, who confirmed that Kuty's signatures were genuine.

At the disciplinary hearing, Kuty claimed that she was in Florida with her children on the day of the closing. Her son's school records indicate, however, that he was in New Jersey on that day.

The DEC was "not persuaded that respondent's acknowledgment of these documents was improper." In contrast, the DRB concluded, after reviewing the record, that the signatures were forgeries. Our independent analysis of the record leads us to conclude that Kuty's signatures on the contract, affidavit of title, and deed were genuine. That finding affects our assessment of both that issue and of the credibility of respondent's testimony.

A related issue concerned the signing of Kuty's name to the settlement and closing agreements at the Dy closing. In respondent's presence, Perretta signed Kuty's name to the settlement agreement. Respondent frankly acknowledges that he likewise signed Kuty's name to the closing statement, adding his own

initials by the signature. Although neither Perretta nor respondent had written authorization from Kuty, respondent assumed that he had "implied authorization" as Kuty's attorney. He also explained that "[b]ecause of the husband/wife relationship, I felt that [Perretta] could sign [Kuty's] name." Additionally, respondent testified that Perretta called Kuty from the closing to obtain her social security number to place it on the federal tax form 1099B, suggesting that she was aware of the transaction and approved it.

The second major issue concerned the tax consequences of the profit generated by the Dy transaction. A portion of the sale proceeds were properly used to pay the mortgages on the property that had been held by Pollack, and to satisfy two judgments affecting the property. To disburse the amount due to the seller, respondent drafted four checks from his trust account, payable jointly to Kuty and Perretta. Perretta's name, however, does not appear on the closing documents. Respondent gave those checks to Perretta without independently informing Kuty. As respondent explained, "Well, sir, I felt it was a happily married couple, husband and wife. The wife had signed the contract. She signed the deed."

Perretta apparently signed Kuty's endorsement on the back of the checks. Respondent assisted Perretta in cashing the checks by writing "OK to cash" on the back and adding his initials. Nothing indicates, however, that respondent knew that Perretta had signed Kuty's signature on the checks.

Until 1988, Perretta and Kuty filed joint federal tax returns. In that year, for the first time in the course of their marriage, Perretta and Kuty filed separate tax returns. Neither declared any gain from the sale of the property. Respondent did not represent Perretta and Kuty in the preparation of their annual tax returns.

According to Kuty's testimony, Perretta was a dreadful failure as a father and a husband. Perretta and Kuty separated in 1991

and engaged in a bitter divorce that terminated their marriage in 1993.

Kuty maintains that she learned of the sale to the Dys in 1993, when the IRS contacted her seeking payment of the capital gains taxes on the sale. After investigation, the IRS determined that Perretta, not Kuty, was responsible for the taxes. The IRS never asserted that anyone had committed tax fraud.

Kuty explained that she instituted the grievance proceeding against respondent at the suggestion of both the IRS and her attorney in the divorce proceeding. In its review of the record, the DRB found that the transactions were designed to defraud the IRS. We disagree.

The DRB found that "[r]espondent concocted the bogus first transaction in an attempt to defraud the IRS through the avoidance of the payment of capital gains taxes due by the Pollacks." Although he structured the transaction to avoid the gain to the Pollacks, the entire profit was transferred to Perretta. No profit was hidden; the only change was in the identity of the responsible party.

Admittedly, Perretta's name did not appear in either set of closing documents. As respondent explained, Perretta's name was omitted not to avoid tax liability, but to protect Perretta from his creditors. The extent to which a lawyer may aid a client to achieve that purpose has not been an issue in these proceedings. Given the age of the proceedings, we believe the better practice is to dispose of this matter without remanding for further consideration of that issue.

Suffice it to say that a lawyer who structures a transaction, as respondent structured this one, runs the risk of adversely affecting third parties. The lawyer also runs the risk that the transaction will unravel because of disagreement among the parties.

In recommending a two-year suspension, the DRB relied on two cases in which the attorneys received two-year suspensions for forging signatures on real estate documents. Both cases, howev-

er, involved misconduct that was substantially more flagrant and malicious than that of respondent. In the first case, *In re Silberberg,* 144 *N.J.* 215, 676 *A.*2d 137 (1996), the attorney witnessed and notarized the signature of a man the attorney knew to be deceased. The attorney also attempted to perpetuate the fraud by providing two false statements to the ethics authorities.

In the second case, *In re Weston,* 118 *N.J.* 477, 572 *A.*2d 604 (1990), the attorney not only signed the client's name without authorization, but also falsely assured the purchaser's attorney that the documents were genuine. In other cases where multiyear suspensions have been imposed, the signatures forged were those of judicial officers. *See, e.g., In re Yacavino,* 100 *N.J.* 50, 494 *A.*2d 801 (1985) (forging judge's name resulted in three-year suspension); *In re McNally,* 81 *N.J.* 304, 406 *A.*2d 1315 (1979) (forging sheriff's name resulted in two-year suspension). The major distinction between those cases and the present one is that this case does not involve forgery.

Respondent mistakenly believed that he and Perretta had authority to sign for Kuty. That respondent signed his own initials to Kuty's name confirms that belief. In addition, respondent has cooperated with the ethics authorities and has been straightforward in his explanations.

■ In addition, our assessment of the effect of respondent's conduct on the IRS differs from that of the DRB. Fraud perpetrated on a public agency is a particularly serious offense, which justifies a multi-year suspension. *See, e.g., In re Gillespie,* 124 *N.J.* 81, 590 *A.*2d 216 (1991) (imposing three-year suspension for willful assistance in filing false corporate returns); *In re Giordano,* 123 *N.J.* 362, 587 *A.*2d 1245 (1991) (imposing three-year suspension for attempted tampering with public records). In the absence of such fraud, the sentence justifiably may be reduced. Our reading of the record leads us to conclude that respondent did not intend to defraud the IRS.

Nonetheless, respondent's ethics violations remain serious. The facts show, by clear and convincing evidence, that respondent ignored a conflict of interest in his representation of both the Pollacks and Kuty in the first 1988 sale, in violation of RPC 1.7. Further, respondent used Kuty as a "strawman" in the two closings, in violation of *RPC* 1.2; failed to communicate with Kuty, in violation of *RPC* 1.4; signed Kuty's name to the closing documents, in violation of *RPC* 8.4(c); and failed to safekeep Kuty's interest in the proceeds of the second 1988 sale, in violation of *RPC* 1.15.

## II.

In the second matter, respondent is charged with a violation of RPC 1.15, failure to safekeep property, for issuing three trust account checks against uncertified funds. Respondent's client, Patricia Najjar, gave respondent an uncertified check that she had received from Hassan Essmaeil as a down payment of sale of her property. Najjar asked respondent to issue her three checks from his attorney trust account against the uncertified check. Respondent agreed. He testified that he called Essmaeil's bank to verify that the account contained sufficient funds, and that would have used his own funds to cover the check if it bounced. Fortunately, the check cleared without incident. No client funds were invaded as a result of respondent's actions. As respondent testified, those actions were taken solely to assist Najjar, rather than to produce a benefit for respondent. Respondent's actions, however, put client funds at risk, in violation of *RPC* 1.15.

## III.

Respondent's violations, although serious, involve excessive negligence and poor judgment, rather than malice. Respondent's motive in both matters was to accommodate, albeit improperly, his clients. The violations nonetheless merit suspension. On balance, we conclude that the appropriate period of suspension is three months.

*For suspension*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, STEIN, and COLEMAN —6.

*Opposed*—none.

## O R D E R

It is ORDERED that **PATRICK DI MARTINI** of **JERSEY CITY**, who was admitted to the bar of this State in 1958, is hereby suspended from the practice of law for a period of three months, effective July 5, 1999, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20 governing suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.