738 A.2d 363

IN THE MATTER OF ANGEL R. PENA, AN ATTORNEY AT LAW.

Argued September 14, 1999—Decided October 22, 1999.

*Tangerla Mitchell Thomas,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Bernard K. Freamon,* argued the cause for respondent.

PER CURIAM.

This matter arose from a grievance filed by Esther Perez, her husband, Lorenzo Perez, and grandson, Jorge Collar (the grievants), alleging that respondent sold their home located at 314 48th Street, Union City (the 48th Street property) without their authorization or knowledge, and that they had never received the sale proceeds. Additionally, the grievants complained that respondent misappropriated certain proceeds from a fire insurance settlement relating to a 1984 fire at the 48th Street property. After an investigation by the District Ethics Committee (DEC) and the Office of Attorney Ethics (OAE), a formal complaint was filed against Pena. The complaint charged respondent with violating the following *Rules of Professional Conduct* (*RPC*): sections 1.7(b) (conflict of interest), 1.15(a) (knowing misappropriation of client funds), 8.1(b) (false statement of material fact in connection with a disciplinary matter), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation).

A Special Master was appointed who found respondent had violated *RPC* 1.7(b), *RPC* 8.1(b), and *RPC* 8.4(a) and (c). The Special Master found, however, that there was not clear and convincing evidence that respondent had misappropriated any insurance proceeds. The Disciplinary Review Board (DRB) sustained the Special Master's findings and recommended that respondent be suspended from the practice of law for eighteen months. We observe that both the Special Master and DRB found that respondent did not misappropriate the grievants' insurance proceeds. Based on our independent review of the record, we agree. There is no evidence that respondent took client funds or that any client funds had been entrusted to him. The sellers received all of the funds to which they were entitled. As the DRB stated in its Decision: "Simply put, there is no evidence, let alone clear and convincing, that respondent took his clients' money."

Respondent filed a petition for review challenging only the DRB's finding that he engaged in dishonesty, fraud, deceit or misrepresentation. Specifically, respondent claims that the record does not support the findings of dishonesty by clear and convincing evidence. Respondent does not contest the finding that he engaged in a conflict of interest by representing his clients, the grievants, in their sale of the 48th Street property to his close personal friends.

Our responsibility in attorney disciplinary matters is to conduct an independent review of the record, *R.* 1:20–16(c), and to determine whether the charges have been proved by clear and convincing evidence. *In re DiMartini,* 158 *N.J.* 439, 441, 730 *A.*2d 346 (1999). Our review of the record leads us to different factual conclusions from those of the DRB. Although we find respondent guilty of ethical infractions, we conclude that the appropriate discipline is a six-month suspension.

I.

Respondent was admitted to the bar in 1984. He worked at a law firm during his school years and for one year after admission to the bar. In the spring of 1985, respondent opened his own office in Union City, where he shared office space with Frank Leanza, a colleague from his prior law firm. In December, 1987, respondent moved his office to the 48th Street property, where he continues to practice.

Respondent was privately reprimanded in 1993 for allowing the statute of limitations to expire on a client's uninsured motorist claim and for failing to release the client's files to her new attorney. Currently pending before the Court is the DRB's recommendation to discipline respondent for violations of *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and *RPC* 8.4(d) (conduct prejudicial to the administration of justice) in connection with his alleged ownership of a bar with two individuals who are not permitted by law to have any interest in a business involving a liquor license.

18

### A.

■ The matter at issue concerns respondent's representation of the grievants in connection with the sale of the 48th Street property. The following facts are undisputed.

In 1984, the grievants sustained substantial damage to their 48th Street property due to a fire. As a result, in 1985, the grievants and Allstate Insurance Company (Allstate), their fire insurance company, became involved in litigation concerning the amount of insurance proceeds due the grievants. The property remained "uninhabitable" and the grievants were unable to make their mortgage payments to the Department of Housing & Urban Development (HUD), which had assumed the grievants' mortgage. Because the grievants continued to live in the "uninhabitable" property, the New Jersey Division of Youth and Family Services (DYFS) was notified and took custody of the Perezes' grandchildren, based on concern about the family's living conditions. The grievants retained respondent to help them suspend their mortgage payments to HUD, work out a new pay-out schedule, and regain custody of their grandchildren. With respondent's assistance, all of those goals were achieved.

On December 24, 1985, respondent prepared a contract of sale for the 48th Street property, initially identifying Frank and Maria Scifo as the purchasers. The contract indicated the sale price as $100,000.00, and the closing date to be March 10, 1986. Respondent "whited out" the names "Frank and Maria" on the contract, replacing them with "Kathleen & John" Scifo. None of the named purchasers signed the Contract of Sale; however, the Perezes signed as the sellers.

In March 1986, John and Kathleen Scifo loaned respondent $30,000.00. That loan is evidenced by a March 1, 1986 promissory note signed by respondent and by a March 13, 1986 cashier's check from the Scifos to respondent. The promissory note provides that upon respondent's repayment of the $30,000.00, the Scifos agree to convey the 48th Street property to respondent or his assigns.

Respondent prepared a deed to the 48th Street property that was dated March 14, 1986 but was not recorded until July 1, 1986. The deed identified the grievants as the grantors and John and Kathleen Scifo as the grantees, with $100,000.00 as consideration. Respondent prepared and grievants signed Affidavits of Title and a closing statement (RESPA). The purchasers did not sign the RESPA. The closing statement showed that the grievants were to receive the sale proceeds of $100,000.00 as follows:

$10,000.00 initial deposit

$21,500.00 at closing

$68,500.00 HUD mortgage to be paid off or assumed by Purchasers

In March 1986, the grievants endorsed checks made payable to them totalling $22,000.00 written from respondent's trust account. The notation on all such checks refers to the Perez–Scifo transfer.

Soon after March 1986, respondent began repairs on the 48th Street property, and in December 1987, respondent moved his law office into the building. Bryan Bajakian, a chiropractor and friend of both respondent and John Scifo, rented the second office. While Scifo received and cashed Bajakian's first two months' rent checks (December 1987 and January 1988), all subsequent rent checks were made payable to Scifo but endorsed by respondent and turned over to respondent's parents.

On June 28, 1988, respondent's parents refinanced their residence (which had an outstanding mortgage balance of $414.32) for the sum of $186,079.82. From the refinancing funds, the Scifos were paid $25,000.00, and the HUD mortgage on the 48th Street property of $76,982.81, was satisfied.

In May 1990, respondent and his then law partners formed the 1590 Anderson Partnership to serve as the managing agent of the 48th Street property. The partnership collects the rent, pays the property taxes, utility bills, and monthly mortgage payments on respondent's parents' mortgage, and makes repairs to the property.

The 48th Street property was transferred by deed dated October 31, 1991, from the Scifos to respondent's parents for the sum

of $1.00. Respondent's partner wrote in his cover letter to the Scifos, "I need you to transfer the title to Mr. & Mrs. Pena, then, I need them to transfer the title to us." Although John Scifo admitted to signing the deed, he stated he did so only after respondent repaid the $30,000.00 in full. Title to the property remains in respondent's parents' name.

B.

The record is not clear because there is substantial conflicting testimony and the grievance was not filed until seven years after the alleged sale. The following facts are disputed.

*Respondent's position*

Respondent testified that John and Kathleen Scifo decided to buy the 48th Street property to provide offices for respondent and their son, John, Jr., who was a doctor. Frank Scifo, the son of John and Kathleen, is respondent's longtime friend and college roommate and respondent enjoyed a longstanding, close personal relationship with all the Scifos who often called him "their third son."

Respondent asserted that, on March 14, 1986, a real estate closing took place at the law office of Frank Leanza, who represented the Scifos. The Scifos paid $32,000.00 in cash to purchase the 48th Street property and agreed to assume the grievants' $68,000.00 mortgage on the property. Respondent represented the Perezes at the closing.

Following the closing, two previously undisclosed mortgages on the 48th Street property surfaced. Respondent satisfied one of these mortgages. In addition to satisfying that mortgage, between 1986 and 1987 respondent renovated the property into office space. According to respondent, shortly after the closing, John Scifo lost interest in the building because his son, John, Jr., did not wish to locate his medical practice there. Therefore, Scifo allegedly asked respondent's father, Alejandro Pena, to serve as the general contractor on the project. None of the construction

permits issued listed John Scifo as record owner. At least one construction permit showed respondent as the owner and another showed Frank Scifo as the record owner.

Two of the contractors were paid from respondent's business and trust accounts. In addition, respondent's partner testified that he questioned respondent on the propriety of paying for the renovations on a building they did not own. Respondent told him it would benefit the practice to present a nice building.

Other people, however, testified that they served as subcontractors on the project and that they were paid either by Scifo in cash, by respondent's father in cash, or by respondent's trust or business account checks. Some testified that Scifo visited the project and even selected certain building materials.

Respondent denies having borrowed any money from the Scifos. Rather, respondent testified that he agreed to sign the note as a favor to the Scifos, who were being audited by the IRS and who needed to "account for the funds." Although respondent denied at the hearing before the Special Master that he had borrowed any funds from the Scifos, he did not deny the same to an attorney whom the Scifos had retained to represent them to collect on the loans.

Respondent explained that he moved his office into the property in December, 1987, and that he and his friend Bryan Bajakinan, a chiropractor (who was also a friend of Frank Scifo) began paying rent to Scifo. Respondent claimed that Bajakian paid the first two months rent checks to John Scifo but respondent thereafter authorized Bajakian to turn the rent checks over to respondent's father to reimburse him for costs and labor relating to the repairs to the building. The record contains seventeen checks from respondent's business account issued between ⅔8 and 9/89. Those checks were made payable to Scifo with the notation "rent" in the memo column. Those checks were either cashed and the proceeds were deposited into respondent's father's account or the checks were endorsed and deposited directly into respondent's father's account. Scifo admitted to endorsing and receiving only two of

those checks in repayment for an unrelated loan. Scifo also denies authorizing respondent to sign his name to any checks and/or to give any of his funds to respondent's father.

C.

*Scifos' Position*

John and Kathleen Scifo testified that they never signed a contract to buy the Perez property, never attended a real estate closing in connection with that property, never retained Frank Leanza to represent them (and had met him only while waiting to testify at the ethics hearing), never agreed to assume the HUD mortgage, never made any repairs to the property and only received payment from respondent relating to loans they had extended to him. However, during a June 8, 1995 OAE interview, John Scifo asserted that he had indeed bought the building for his son John, Jr.'s, medical office. He claimed that respondent's father mentioned the building to him at a party; they agreed that Scifo would buy the property and they agreed that Alejandro Pena would be responsible for the renovations. Scifo further alleged at the OAE interview that, after his son John, Jr., decided to remain in Staten Island, Scifo was "stuck" with the building. He remembered that, in 1991, Alejandro Pena sent him a deed conveying the property to Scifo for $1.00. Scifo added that he had obtained an attorney through Alejandro Pena. Although Scifo could not recall the attorney's last name, because Scifo had a son named Frank, he remembered that the attorney's first name was Frank. Scifo stated that Alejandro Pena had insisted on giving him title to the property in order to secure a loan from him to respondent.

At the ethics hearing, Scifo explained that, initially, at respondent's request, he had tried to protect respondent by asserting that he had bought the Union City property. However, when Scifo realized that he was placing himself in jeopardy, he decided to be more forthcoming. Thus, Scifo testified that while he had initially told the OAE that he had bought the building, in reality, he had merely loaned money to respondent.

### Leanza Testimony

Frank Leanza testified that he never represented the Scifos on any matter, including the purchase of the Perez property. He asserted that a thorough search of his files revealed no record of this transaction. Although Leanza testified at the ethics hearing that he did not represent the Scifos at a real estate closing, during a 1995 interview with the OAE Leanza stated that he remembered representing "a guy by the name of Scifo who bought some property in Union City, an old building in Union City." Leanza, an experienced attorney in 1986, cited numerous problems with the contract and closing documents of the sale, asserting that he would not have permitted such terms had he represented the buyers.

Although Leanza testified that he did not represent the Scifos and was not involved in the Perez real estate transaction, checks were issued from Leanza's trust account to HUD in payment of the mortgage on the 48th Street property. The mortgage payments to HUD were drawn on Leanza's account after corresponding amounts were deposited. Those corresponding funds took the form of "rent" checks from Bajakian and respondent payable to Scifo. According to Leanza, he had run those checks through his trust account at respondent's request because respondent felt that, as the Scifos' tenant, he would be in a conflict of interest situation if he paid HUD on the Scifos' behalf.

## II.

The DRB summarizes the problems with the conflicting testimony of respondent, John Scifo and Leanza as follows:

At first blush, respondent's position that the Perezes sold the property to the Scifos appears outlandish. After all, every other purported participant in the real estate closing-the Perezes, the Scifos and Leanza-denied that such a closing occurred. Moreover, the HUD records do not disclose any notice of sale of the property or assumption of the mortgage until two years after the closing, when respondent submitted the mortgage payoff with funds received from his parents after they refinanced their home mortgage. However, John Scifo initially asserted that he had indeed bought the building and had been represented by an attorney named "Frank," although he later recanted that version and Leanza, too, told the OAE

that he had represented Scifo in the purchase of property in Union City. In addition, Leanza issued four checks to HUD from his trust account, having first deposited two rent checks from Scifo and three from Bajakian; Leanza explained that he merely ran checks through his trust account as a favor to respondent. Furthermore, Esther Perez had also accused her prior attorney, Agrait, of trying to sell her property without her consent, raising concerns about her credibility.[1]

Despite the conflicting statements and the credibility issues, the DRB found that there was strong evidence that respondent purchased the property from the Perezes. Respondent signed a promissory note on March 1, 1986 and received a check for $30,000.00 on March 13, 1986, one day before the closing. This evidence suggested that respondent borrowed the $30,000.00 from the Scifos to buy the Perez property.

Further, the contract of sale produced by respondent was not signed by the Scifos. Respondent did not record the deed until more than three months after the closing, did not notify HUD of the sale, and did not take any steps to ensure that the HUD mortgage had been properly assumed.

Additionally, respondent's actions were consistent with those of a property owner. He negotiated the rent with Bajakian and paid most of the contractors and subcontractors who repaired the building. Moreover, respondent's law firm currently pays the taxes and the repair expenses on the property, and the 1590 Anderson partnership pays respondent's parents' mortgage.

We agree with the DRB that "at first blush," respondent's account of the events does not appear credible. However, although many business relationships between close friends are conducted in a very informal manner, the statements of the Scifos, who are experienced business people, and of Leanza, who is an experienced attorney, raise substantial credibility issues. Certainly, there is "strong" evidence that respondent crafted fictitious transactions to conceal his conflict of interest. There is also strong evidence indicating that the Scifos did indeed purchase the

[1] The grievants did not complain about respondent until seven years after the sale.

48th Street property. Although it appears more likely than not that respondent engaged in concealment of his purchase of the 48th Street property, the record does not establish by clear and convincing evidence that respondent engaged in dishonest conduct and created two sham transactions. As the Special Master suggested, it is not clear why respondent went to so much trouble to conceal conduct that probably would have resulted in no more than a reprimand had he not concealed it. Hence, we reach a different conclusion on the factual record than did the DRB. Although this is an extremely close case, we conclude that there is not clear and convincing evidence that respondent violated *RPC* 8.4(c) in matters involving the sale of the 48th Street property.

### III.

The question of what discipline should be imposed remains. The DRB recommended an eighteen-month suspension, based on its determination that respondent had engaged in dishonest conduct in creating the two sham transactions. We disagree with the DRB's conclusion that respondent violated *RPC* 8.4(c). However, we find that respondent's conduct clearly indicates that he did not appreciate the importance of avoiding conflicts of interest and thereby violated *RPC* 1.7(b). Generally, we have found that a public reprimand constitutes appropriate discipline in cases involving conflicts of interest where there are no egregious circumstances or serious economic injury to the clients involved. *In re Berkowitz*, 136 *N.J.* 134, 148, 642 *A.*2d 389 (1994). Here, respondent's clients suffered no economic harm. *Cf. In re Dato*, 130 *N.J.* 400, 614 *A.*2d 1344 (1992) (imposing one-year suspension on attorney who purchased client's property at below fair-market price); *In re Gallop*, 85 *N.J.* 317, 426 *A.*2d 509 (1981) (imposing six-month suspension on attorney who took deed to housekeeper's real property to her disadvantage); *In re Hurd*, 69 *N.J.* 316, 354 *A.*2d 78 (1976) (imposing three-month suspension on attorney who advised client to transfer title to real property to attorney's sister for twenty percent of property's value).

The Court found in *In re DiMartini, supra,* 158 *N.J.* at 439, 730 *A.*2d 346, that the respondent ignored a conflict of interest in the purchase and sale of a residential dwelling, in violation of *RPC* 1.7. In addition, the Court found that the respondent's infraction and other ethical misconduct, although serious, involved excessive negligence and poor judgment rather than malice. The Court concluded that the appropriate period of suspension was three months. However, in *In re DiMartini,* the respondent did not act for his own pecuniary benefit, whereas here respondent purchased the 48th Street property for his own economic benefit. An attorney's judgment can be impaired by his self-interest. Hence, we have warned attorneys of the dangers of engaging in business transactions with their clients. *E.g., In re Humen, supra,* 123 *N.J.* 289, 300, 586 *A.*2d 237 (1991).

Respondent offers in mitigation the testimony of Dr. Oscar Sandoval, a psychiatrist, who testified that John Scifo exercised unusual control over respondent by virtue of respondent's borderline personality disorder. We find in mitigation that there is no evidence of economic harm to respondent's clients, that the acts for which he is being disciplined occurred between 1986 and 1988, nine to eleven years ago, that he had recently been admitted to the bar, and that he was a young and inexperienced attorney when he represented the Perezes.

Respondent concedes that he ignored the conflict of interest in his sale of the 48th Street property to his friends, the Scifos, in violation of *RPC* 1.7. Respondent's violations are serious and merit suspension. Although no economic harm occurred to respondent's clients, he acted for his own pecuniary benefit. On balance, we conclude that the appropriate period of suspension is six months. Respondent is also ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

## ORDER

It is ORDERED that **ANGEL R. PENA** of **FORT LEE,** who was admitted to the bar of this State in 1984, is hereby suspended

from the practice of law for a period of six months, and until the further Order of the Court, effective November 17, 1999; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20 which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

*For suspension*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.