740 A.2d 1074

IN THE MATTER OF SETH MININSOHN, AN ATTORNEY AT LAW.

Argued September 13, 1999—Decided December 3, 1999.

*Nitza I. Blasini*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Andrew P. Napolitano* argued the cause for respondent (*Sills Cummis Radin Tischman Epstein & Gross,* attorneys; *Mr. Napolitano* and *Steven R. Rowland,* of counsel and on the brief).

PER CURIAM.

This attorney discipline proceeding arose when the Office of Attorney Ethics (OAE) was notified of an overdraft in respondent Seth Mininsohn's attorney trust account. After an investigation by the OAE, a formal complaint was filed against respondent. The complaint was based on fifteen real estate transactions in which respondent withdrew his legal fee from his trust account before it had been earned, and on six occasions on which respondent disbursed trust account funds to himself when he had insufficient funds on deposit. The complaint charged respondent with violating the following *Rules of Professional Conduct (RPC):* *RPC* 1.15(a) (knowing misappropriation of client funds); *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit and misrepresentation); *RPC* 1.15(c) (failure to safeguard client funds); *RPC* 1.15(d) (failure to comply with the provisions of *R.* 1:21–6).

The Special Master found clear and convincing evidence that respondent violated *RPC* 1.15(a), *RPC* 8.4(c), *RPC* 1.15(c), and *RPC* 1.15(d) because he engaged in knowing misappropriation of escrow and trust account funds in thirteen of the fifteen real estate transactions. The Disciplinary Review Board (DRB) sustained the Special Master's finding that Respondent knowingly misappropriated clients' funds and failed to properly maintain records as required by *R.* 1:21–6. Additionally, the DRB found clear and convincing evidence in the record demonstrating that respondent disbursed trust account funds to himself when he had insufficient funds on deposit. Pending before the Court is the DRB's recommendation to disbar respondent because of those violations.

In response to an Order to show cause why he should not be disbarred or otherwise disciplined, respondent contended that his inexperience and lack of training in managing a trust account led

him mistakenly to conclude that he had an equity "cushion" in his trust account. Respondent believed that his trust account had a "cushion" because he did not always withdraw the fees that he had earned from other transactions. Respondent insisted that his ignorance of trust account bookkeeping was the reason for the negative balance found in his trust account. Accordingly, respondent contended that he acted negligently, not knowingly, in invading client or escrow funds.

■ Our responsibility in attorney disciplinary matters is to conduct an independent review of the record, R. 1:20–16(c), and to determine whether the charges have been proved by clear and convincing evidence. *In re Di Martini*, 158 N.J. 439, 441, 730 A.2d 346 (1999). We note that both the Special Master and DRB found by clear and convincing evidence that respondent had knowingly misappropriated client funds, and that the DRB found by clear and convincing evidence that respondent had disbursed trust account funds to himself and in the process had invaded client funds. Based on our independent review of the record, we agree with those conclusions.

I

Respondent was admitted to the New Jersey bar in 1985. On graduation from Hofstra Law School, respondent worked as a junior associate to the in-house counsel of Schiavone Construction Company. While employed by Schiavone, respondent's responsibilities were limited to contract negotiations and resolution of contractor-subcontractor disputes.

In 1990, respondent left Schiavone and opened a law office in Hoboken, New Jersey. Initially, his law practice was limited to small commercial matters. As his practice developed, he handled a large number of real estate transactions. Respondent instituted his own accounting system, using a checkbook and post-it notes to manage the financial affairs of his law practice. Respondent never employed an accountant or another attorney in his practice,

but he occasionally hired part-time non-legal support personnel to assist him.

## A

On March 29, 1994, Hudson United Bank notified the OAE of an overdraft in respondent's attorney trust account. The OAE informed respondent of the trust account overdraft notice and requested an explanation. In response, respondent wrote four letters to the OAE that tried to explain the overdraft. Dissatisfied with respondent's explanations, the OAE informed him that it would conduct an audit of respondent's books and records for the period from January 1, 1991 to July 1994.

On the basis of that audit, the OAE filed a four-count complaint charging respondent with the knowing misappropriation of escrow and trust funds as well as with recordkeeping violations. The charges stemmed from nine real estate transactions in which respondent represented sellers and withdrew his legal fees from escrow funds before closing; six real estate transactions in which respondent, usually representing buyers, advanced himself legal fees from other clients' funds; and six instances in which respondent disbursed funds to himself from his trust account when that account had insufficient funds on deposit.

## 1

Respondent represented the seller and was the escrowee for the buyer's deposit on nine occasions. Those real estate transactions required respondent to hold in escrow the buyer's deposit until the closing of title, at which time those funds would be paid to the seller. The facts pertinent to the nine occasions on which respondent represented the seller and was the escrowee for the buyer's deposit are as follows:

In the *Schulte* matter, the closing took place on December 31, 1990. The client ledger sheet showed receipt of $1,000 and $17,500 during October 1990. Respondent's bill for the closing

was $4,051. The ledger sheet showed a $1,600 disbursement to respondent for fees and disbursements on December 21, 1990. The check was signed by respondent, and included a notation "Schulte" that was made at the time the check was written. The ledger sheet also showed a $2,451 disbursement for the balance of respondent's fee on December 31, 1990, the date of the closing. The check was signed by respondent and also included the notation "Schulte." Respondent testified that he believed he was entitled to take a partial fee when his client signed the deed on December 21, 1990.

In the *Alongi* matter, the closing never occurred. The client ledger sheet showed the receipt of $1,000 and $6,500 during November 1990. The ledger sheet showed an $800 disbursement to respondent for fees and disbursements on March 18, 1991. The check was signed by respondent, and included a notation "Alongi fees/costs" that was made at the time the check was written.

In the *Merrill Lynch* matter, the closing took place on April 26, 1991. The client ledger sheet showed the receipt of $24,000 on April 17, 1991 and $96,000 on April 26, 1991. The ledger sheet showed a $150 trust account check and a $1,450 wire transfer to respondent on April 17, 1991. The wire transfer actually occurred on April 15, 1991. Respondent testified that he thought he was entitled to a fee on April 17, 1991 because the closing documentation was signed on that date.

In the *Tax* matter, the closing took place on September 16, 1991. The client ledger sheet showed the receipt of $1,000 on May 23, 1991 and $14,100 on June 11, 1991. The ledger sheet showed a $750 disbursement to respondent for fees and disbursements on June 17, 1991. The check was signed by respondent, and included a notation "Rice/Tax" that was made at the time the check was written. The ledger sheet showed an additional $100 disbursement on September 16, 1991, the date of the closing. The $100 represented the balance of respondent's fee.

In the *Fleet Funding* matter, the closing took place on May 29, 1992. The client ledger sheet showed receipt of $1,000 and $5,000

in April 1992. Respondent's bill for the closing was $1,000. The ledger sheet showed a $750 disbursement to respondent for fees and disbursements on April 21, 1992. The check was signed by respondent. The ledger sheet also showed a $250 disbursement for the balance of respondent's fee on May 29, 1992, the date of the closing.

In the *Gatton* matter, the closing took place on July 15, 1992. The client ledger sheet showed receipt of $12,850 and $1,000 in June 1990 and an additional $900 on the closing date. Respondent's bill for the closing was $900. The ledger sheet showed a $700 disbursement to respondent for fees and disbursements on June 10, 1992. The check was signed by respondent. The ledger sheet also showed a $200 disbursement for the balance of respondent's fee on July 15, 1992, the date of the closing.

In the *Swan* matter, the closing took place on January 6, 1994. The client ledger sheet showed receipt of $36,500 in September 1993 and an additional $1,000 on the closing date. The ledger sheet showed a $1,000 disbursement to respondent for fees and disbursements on November 9, 1993. The check was signed by respondent, and included a notation "Fees/Costs Swan" that was made at the time the check was written.

In the *Alexander* matter, the closing took place on February 11, 1994. The client ledger sheet showed receipt of $16,800 in January 1994. The ledger sheet showed an $800 disbursement to respondent for fees and disbursements on January 27, 1994. The ledger sheet also showed a $10,000 disbursement to Donna Jacobites on February 10, 1994 and a $6,000 disbursement to Charles Alexander on February 12, 1994. The check to Donna Jacobites included a notation "Alexander" that was made at the time the check was written. The check to Charles Alexander included a notation "$10,800 escrow minus $10K to DJ minus $800 SM Alexander to Foley" that was made at the time the check was written.

In the *Brown III* matter, the closing took place on March 15, 1994. The client ledger sheet showed receipt of $7,500 on Febru-

ary 22, 1994. The ledger sheet showed a $750 disbursement to respondent for fees and disbursements on the same day. The check was signed by respondent.

2

The facts pertinent to the six occasions on which respondent disbursed fees to himself before receipt of funds in the matter are as follows:

In the *Rice* matter, respondent represented the seller and was the escrowee for the buyer's deposit. The client ledger sheet showed receipt of $15,888 on June 27, 1991 and $500 on July 1, 1991. On June 17, 1991, respondent issued a check to himself for $1,500 and attributed $750 of that amount to his fee in this matter. The check was signed by respondent, and included a notation "Rice/Tax" that was made at the time the check was written. On September 3, 1991, the date of the closing, the ledger sheet showed a $965 disbursement to respondent for fees and disbursements. The check was signed by respondent, and included a notation "100Rice/865Larkin" that was made at the time the check was written. The $100 represented the balance of respondent's fee.

In the *Burnett* matter, respondent represented the buyer. Respondent was not acting as escrowee. The client ledger sheet showed the receipt of $9,700 on September 16, 1991. The ledger sheet showed a $1,350 disbursement to respondent on September 12, 1991 for fees and disbursements. The check was signed by respondent, and included a notation "Burnett" that was made at the time the check was written.

In the *Walter* matter, respondent represented the buyer. The client ledger sheet showed the receipt of $271,727.39 on September 25, 1991. The ledger sheet showed a $965 disbursement to respondent on September 17, 1991 for fees and disbursements. The check was signed by respondent, and included a notation "Walter" that was made at the time the check was written.

In the *Zonenberg* matter, respondent represented the buyer. The client ledger sheet showed the receipt of $104,445.40 and $16,497.15 on October 26, 1992. The ledger sheet showed a $900 disbursement to respondent on October 22, 1992 for fees and disbursements. The ledger sheet also showed a $130 disbursement to respondent on October 26, 1992 for the balance of respondent's fee of $1,030.

In the *Shapiro* matter, respondent represented an owner in a refinancing transaction. The client ledger sheet showed receipts of $66,997.60 and $665 on December 22, 1992. The ledger sheet showed a $770 disbursement to respondent on December 17, 1992 for fees and disbursements. The check was signed by respondent, and included a notation "Shapiro" that was made at the time the check was written.

In the *Evans* matter, respondent represented the buyer. The client ledger sheet showed the receipt of $95,700.98 on July 20, 1992. The ledger sheet showed a $965 disbursement to respondent on July 17, 1992 for fees and disbursements. The ledger sheet also showed a $40 disbursement to respondent on July 20, 1992 for the balance of respondent's fee of $1,005.

3

Respondent made several payments from his attorney trust account to himself and recorded those transactions in a document entitled "Surplus Funds Client Ledger" ("Ledger"). The evidence is disputed whether those Ledger entries were made contemporaneously with or subsequent to the withdrawals from Respondent's trust account. The Ledger did not contain a running balance. An analysis of respondent's records showed that six withdrawals from respondent's trust account resulted in a negative balance.

On August 19, 1991, respondent issued a $1,716.67 check to himself and posted $1,450 of those funds to the Ledger. That transaction caused the trust account balance to decrease from a positive balance of $125.24 to a negative balance of $1,324.76. Three days later, respondent's $850 disbursement to himself further increased the negative balance to $2,174.76. A November 5, 1991 check for $239.16 followed by a December 3, 1991 check for

$8.33 resulted in a negative balance of $2,422.25. Respondent retained earned fees of $1,075 in his trust account in December 1991 and deposited personal funds of $1,500 to his trust account in January 1992, thereby bringing the trust account to a positive balance of $152.75. However, respondent issued a $2,300 check to himself on February 14, 1992 that resulted in a negative trust account balance of $2,147.25. Respondent issued a $4,250 check to himself on June 16, 1992, of which only $2,750 could be accounted for as fees in three client matters. That transaction increased the negative balance of the trust account to $3,647.25.

B

Respondent contends that the OAE has failed to establish by clear and convincing evidence that he knowingly misappropriated escrow or trust funds. Respondent claims that the OAE has not offered any evidence of his intent to steal from his clients. Respondent argues that disbarment is inappropriate if he negligently misappropriated client funds. Respondent maintains that he did not know he was taking his clients' funds and, therefore, should not be disbarred.

The Special Master concluded that, in the *Schulte* and *Merrill Lynch* matters, respondent's belief that he was entitled to take his fee supported a finding of negligent, but not knowing, misappropriation. In those two real estate transactions, documentation was signed that transferred title to the buyer prior to the closing date. However, the DRB disagreed with the Special Master's conclusion in the *Merrill Lynch* matter. The DRB determined that even if respondent had a good faith, but mistaken, belief that he had earned his fee on the date the closing documentation was signed, the fact remained that he paid himself the fee two days earlier.

Additionally, respondent contends that he believed he had a cushion in his trust account from which he could properly draw. Respondent argues that his mistaken belief that he had a cushion

in his trust account does not support the conclusion that he knowingly misappropriated client trust funds.

## II

### A

The central issue is whether respondent knowingly or negligently invaded client funds. Knowing misappropriation of client funds is an ethical violation under *RPC* 1.15(a) and (c). Misappropriation that results in disbarment "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986). Disbarment is required for the misappropriation of either escrow funds or client trust funds because of the obvious parallel between escrow funds and trust funds. *In re Hollendonner,* 102 *N.J.* 21, 28, 504 *A.*2d 1174 (1985).

Intent to steal funds from a client is not an element of knowing misappropriation. *In re Barlow,* 140 *N.J.* 191, 198, 657 *A.*2d 1197 (1995). The motive of an attorney ordinarily is irrelevant in determining the appropriate punishment for knowing misappropriation. *In re Greenberg,* 155 *N.J.* 138, 156, 714 *A.*2d 243 (1998); *Barlow, supra,* 140 *N.J.* at 195, 657 *A.*2d 1197; *Noonan, supra,* 102 *N.J.* at 160, 506 *A.*2d 722. This Court consistently has applied the long-standing rule that "disbarment is the only appropriate discipline" for knowing misappropriation of client funds. *In re Wilson,* 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979).

However, clear and convincing evidence is required to prove that respondent knowingly misappropriated client funds. *In re Konopka,* 126 *N.J.* 225, 234, 596 *A.*2d 733 (1991) (holding that attorney's careless record-keeping was evidence of negligent misappropriation of client funds). The *Wilson* rule is not applicable unless there is clear and convincing evidence that respondent knowingly misappropriated client funds. *In re Roth,* 140 *N.J.* 430, 444, 658 *A.*2d 1264 (1995); *Barlow, supra,* 140 *N.J.* at 196, 657 *A.*2d 1197 ("Proof of misappropriation, by itself, is insufficient to

trigger the harsh penalty of disbarment. Rather, the evidence must clearly and convincingly prove that respondent misappropriated client funds knowingly."); *Hollendonner, supra,* 102 *N.J.* at 29, 504 *A.*2d 1174.

B

█ Respondent claims that he never would have taken client funds unless he believed that he was legally entitled to those funds as his fee for legal services. However, the record indicates that where respondent represented sellers in real estate transactions he frequently advanced his legal fee to himself from the buyers' deposit funds before closing, even though the underlying contracts required that he retain those deposit funds until the closing. Respondent also advanced fees to himself in certain matters before he had received any funds relating to the matter, thereby invading client funds unrelated to those transactions. Respondent acknowledged his familiarity with the rule that attorneys are not entitled to take fees in a real estate transaction until the transaction has been completed.

The contemporaneously written notations on the checks by respondent support the conclusion that he was aware that he was taking fees prior to earning them. That conclusion also is supported by the fact that, in some instances, respondent withdrew a fee at closing that, combined with his previously advanced fee, exactly equaled the fee respondent had established for his services.

Respondent also maintained a Ledger in which he kept track of the amount of funds he removed from his trust account. Respondent never knew the running balance in his trust account, but he asserts that he "assumed" that he had extra funds from which he could draw. However, respondent's testimony in support of his assertion that he believed there was a "cushion" in his trust account was vague and unpersuasive. In response to a question from his counsel, respondent testified that on approximately twenty occasions he "accidentally" had omitted to withdraw fees that he had earned from his trust account. Respondent also testified

that whenever he withdrew escrow fees in advance of a closing, the withdrawal was based on his assumption that he had an equivalent "cushion" in his trust account. However, respondent did not attempt to offer any specific factual basis for that assumption, and respondent's own expert testified that when he performed a reconciliation of the trust account he determined that "there weren't always sufficient funds on hand, and he was always indeed out of trust." Respondent's erroneous belief that he had an equity cushion was unfounded, and respondent failed to offer evidence to sustain the contention that his belief in the existence of an adequate cushion was reasonable or justifiable.

### III

Respondent contends that he did not intend to steal from his clients, but intent to steal is not required to establish knowing misappropriation. Respondent was fully aware that he was disbursing fees to himself before he had fully earned them. His erroneous belief that he had a cushion in his trust account does not absolve him of knowledge of his misappropriations. The record contains clear and convincing evidence that respondent knowingly misappropriated escrow and trust funds to pay himself unearned legal fees. Accordingly, we adopt the recommendation of the DRB and order that respondent be disbarred. Respondent is ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For Disbarment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.

### O R D E R

It is ORDERED that **SETH MININSOHN** of **HOBOKEN**, who was admitted to the bar of this State in 1985, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **SETH MININSOHN** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **SETH MININSOHN** comply with *Rule* 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that **SETH MININSOHN** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.