703 A.2d 895

IN THE MATTER OF ROBERT H. OBRINGER,
AN ATTORNEY AT LAW.

Argued October 6, 1997—Decided November 21, 1997.

*Michael J. Sweeney*, Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Carl D. Poplar*, argued the cause for respondent (*Poplar & Eastlack*, attorneys; *Teri S. Lodge*, on the brief).

PER CURIAM.

This is an attorney-disciplinary case. Respondent was admitted to the bar of New Jersey in 1982. At the time of the alleged offenses he practiced in Marlton, New Jersey where he specialized

in bankruptcy law. The Office of Attorney Ethics filed a complaint charging respondent with knowingly misappropriating escrow funds contrary to *RPC* 1.15, knowingly making a false statement to a tribunal contrary to *RPC* 3.3(a)(1), and engaging in conduct involving dishonesty, fraud, deceit and misrepresentation contrary to *RPC* 8.4(c).

A Special Master conducted a hearing on behalf of District XIV Ethics Committee. At the conclusion of the hearing, the Special Master concluded that respondent violated *RPC* 3.3(a)(1), *RPC* 8.4(b), and *RPC* 8.4(c), and recommended a two-year suspension. The Disciplinary Review Board (DRB) agreed with the Special Master that respondent committed the following ethical infractions: making false statements to a tribunal, *RPC* 3.3(a)(1); stealing funds from a tribunal that reflects adversely on a lawyer's honesty, trustworthiness and fitness to be a lawyer, *RPC* 8.4(b); and engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, *RPC* 8.4(c). The DRB unanimously recommended disbarment. Based on that recommendation, this Court ordered respondent to show cause why he should not be disbarred or otherwise disciplined.

After conducting a *de novo* examination of the record, we adopt the largely uncontested factual findings made by the DRB:

Respondent specialized in bankruptcy law. His name was on a list used by the United States Trustee for the District of New Jersey to appoint trustees in bankruptcy proceedings. Respondent was appointed as trustee in a case in which the debtor was Gaskill Construction, Inc. ("Gaskill"). Serving in that capacity, on November 20, 1995, respondent filed a *Notice Depositing Funds to the Registry of the Court Pursuant to Local Rule 12(b)*. The notice recited that respondent, as trustee, had disbursed all of the funds in the trustee's account, with the exception of $20,733.93, representing (1) claim number 53 for $8,902.62 filed by LCW Leasing Co., c/o Ronnie Schwartz, Esq., 1500 The Fidelity Building, Philadelphia, Pennsylvania 19109 and (2) claim number 56 for $11,831.31 filed by Equileasing, 750 Third Avenue, New York, New York 10017. Respondent attached to the notice a check for $20,733.93 payable to the Registry of the Court. Respondent deposited those funds in court because he asserted that he was unable to locate those two creditors. On December 14, 1995, respondent filed a *Trustee's Certification of Completion of Estate Administration and Application for Discharge* asserting that he had completed all the requisite duties as trustee and requesting that he be discharged. Although the record does not contain any documentation on the issue, it is

presumed that respondent was discharged as the trustee in the *Gaskill* bankruptcy matter.

Two months later, on or about February 21, 1996, respondent opened Post Office Box 254, Audubon, New Jersey 08206. He then created a letterhead for a law firm, Ciob & Associates, showing an office address in Elkins Park, Pennsylvania and a New Jersey address of Post Office Box 254, Audubon, New Jersey. On February 27, 1996, respondent sent a letter to Sharon Newman, Financial Deputy of the United States Bankruptcy Court. Although respondent wrote the signature on the letter, it purported to be signed by a Ronnie Schwartz, Esq., of Ciob & Associates. The letter declared that Ronnie Schwartz represented two creditors in the *Gaskill* bankruptcy matter and requested payment of the funds due them. Attached to the February 27, 199[6] letter were two documents: a letter dated January 18, 1996 purporting to be from respondent to Ronnie Schwartz and a release, purportedly signed by Equileasing personnel, authorizing Ronnie Schwartz to collect the funds due from Gaskill.

Based on the February 27, 199[6] letter, the bankruptcy court entered two orders dated March 8, 1996 directing that checks in the amount of $11,831.31 and $8,902.62 be made payable to Equileasing and LCW Leasing Co., respectively. The checks, dated April 8, 1996, were issued to the name of Ronnie Schwartz and sent to Ciob & Associates at the Audubon post office box. Respondent had opened a checking account at Community National Bank bearing number 42–03576 in the name of Robert H. Obringer, EAF Gaskill. He "signed" Ronnie Schwartz's name as endorsements on the checks and deposited them into the new checking account. Respondent wrote three checks against these funds to pay for certain personal expenses. One check for $10,354 was issued to the Internal Revenue Service on April 15, 1996; another for $5,600 was payable to himself on April 19, 1996 and used to pay outstanding debts; and a third one for $4,126.48 was issued to American Express to pay a personal charge account.

In May 1996, respondent was diagnosed with cancer of the mouth. He underwent surgery and a lengthy period of hospitalization. In his absence from the office, the Levenson firm members monitored his mail. Apparently, respondent had the bank statements from the Community National Bank checking account sent to his office address. When the Levenson firm noticed a bank statement purporting to be from the *Gaskill* checking account, it investigated the matter and learned the truth. By letter dated July 9, 1996, the partners of the Levenson firm reported respondent's conduct to the District IIIB Ethics Committee secretary. Respondent signed the letter, indicating that it was sent with his knowledge and consent. The Levenson firm also made restitution of the funds to the court registry.

At the hearing before the special master, it was agreed that certain evidence submitted on behalf of respondent would be considered in mitigation, but not as exculpation, for his misconduct. Four character witnesses testified in respondent's behalf: Donald Levenson, one of his law partners; Charles Nathanson, a former partner in the Levenson firm; Joseph McCormick, a Haddonfield attorney with a bankruptcy practice; and Morton Batt, non-lawyer bankruptcy trustee. All four testified generally that respondent was trustworthy, with good morals and with an outstanding reputation for honesty.

Respondent also testified at the ethics hearing. He contended that, in the latter part of 1995 and early 1996, he began to experience serious personal problems, including marital difficulties and his eventual move out of the marital home. Respondent also alluded to problems dealing with the departure of Charles Nathanson from the Levenson firm; respondent felt that he had let another partner manipulate him into forcing Nathanson to leave the firm. At the same time, respondent's father, who resided in Pittsburgh, had suffered a stroke and lost both legs as well as the use of his right arm. Respondent's father passed away in August 1996.

According to respondent, in retrospect, taking the funds from the court registry did not make any sense because he had funds available from several sources: individual retirement accounts ("IRA"), a life insurance policy against which he could have borrowed, a loan from Donald Levenson, and large fees coming due from files he was about to close. When asked for an explanation for his misconduct, respondent speculated that he was sending himself a "horrible message that the circumstance I *was in had to change.*" He added that, although he was diagnosed with cancer shortly after the above events took place, his physician could not confirm that the disease had affected him in such a way as to account for his misconduct.

On cross-examination, respondent testified that, once he paid the funds into the court registry, he no longer had control over them and did not consider them to be escrow funds. Respondent remarked that the funds would belong to the federal government after three years, if no creditor claimed them. He conceded that, when he applied for payment from the court, he knew that the court registry was *holding the money in escrow for the two creditors. Respondent also admitted that,* when he opened the bank account and post office box to carry out his scheme of misappropriating the funds, he was aware of what he was doing, but felt "controlled" by the event.

With regard to the other sources of money available to him, respondent acknowledged that he would have incurred interest and penalties if he were to withdraw an IRA. He added that, if he had borrowed against his life insurance policy, his wife would have found out because either she or their children were the beneficiaries.

In mitigation, respondent submitted the report of two mental health professionals, Gerald Cooke, Ph.D, a psychologist, and Robert L. Sadoff, M.D., a psychiatrist. Dr. Cooke conducted a psychological evaluation of respondent and submitted a report dated January 5, 1997. He discussed with respondent the circumstances surrounding the misappropriation of funds from the court registry. According to the report, respondent gave the following account of those events:

> He [Mr. Obringer] says that in February of 1996 he was listening to Rush Limbaugh about waste in the government and thought that there was $20,000 that was going to go to the Federal Government and he decided to retrieve that money for himself. When asked why, after a lifetime in which he had not engaged in any illegal activity, he did this, and did not reject the idea Mr. Obringer was at a loss to explain it except to say that in a number of areas in his life he has made decisions without really stopping to think them out. . . . [H]e did not seem to realize the coincidence in time: That is, that he basically enacted this scheme within one to two days prior to leaving his wife. Subsequent

activities related to the charges extended to May 3 of 1996, predating his diagnosis of cancer and his operation, so it is clear that the cancer did not have anything to do with it....

Several other aspects of this situation were discussed with Mr. Obringer. This examiner asked him if he needed money at that time. His response to that was 'yes and no.' He indicates that he had run up the balances on his credit cards because of trips, dinners, and presents associated with Betsy [respondent's paramour]. By the same token he indicates that he could have easily cashed in an IRA or stopped doing charitable work and bill more time or finish up a Trustee case which would have paid him $75,000. When asked how he justified or rationalized his behavior he indicated that he did not. He simply did not stop and think. This examiner believes, however, that the nature of the process clearly required some thought and planning and Mr. Obringer is either not sharing his justification or really was unaware of why he acted the way he did, other than the above mentioned comments by Rush Limbaugh.

Dr. Cooke diagnosed respondent as suffering from a personality disorder, not otherwise specified, with self-defeating features and an adjustment disorder with depressed mood and features of anxiety and guilt. Dr. Cooke discussed the effect these disorders had on respondent's actions:

Regarding the issue of whether Mr. Obringer's mental state at the time meets the criteria for 'diminished capacity' I would state the following: While Mr. Obringer has acted without sufficient thought at a number of times throughout his life and then had guilt for it, he has never acted in an antisocial or criminal manner and from that perspective this is an isolated and idiosyncratic behavior which is uncharacteristic of his general personality functioning. It is further my opinion, as contained in the text of this report, that during the period in which he engaged in this activity he was under an exacerbation of his generally higher then average tension level due to his internal conflict and guilt over leaving his marriage to be with another woman. While the obtaining of the post office box was on 2/21, this, in and of itself, did not yet constitute an illegal act. The fact that he actually put the illegal act into motion the day before he left his wife is, in this examiner's opinion, important in the light of the personality dynamics discussed above. This examiner usually does not believe that individuals who commit criminal acts want to get caught and I generally write that off as a trite and incorrect phase. However, in understanding Mr. Obringer's personality functioning going as far back as his mid-teenage years indicate that guilt is an important part of his personality structure and the fact that he put this scheme into action one to two days prior to leaving his wife is consistent with an individual who, out of guilt, had an unconscious need to punish himself and committed an act in such a way that would ensure that. Thus, in my opinion he was suffering from a significantly reduced mental capacity at that time which contributed directly to the commission of the offense.

Similarly, in his January 16, 1997 report, Dr. Sadoff gave the following summary of respondent's recitation of the events surrounding the misappropriation of funds:

It took several weeks or months for him to set up the problem which causes him his current legal difficulty. He said it was not 'a one shot deal.' He said there

were a number of different steps that had to be taken along the way. He states as he thinks about what happened, he believes that once he started the journey, he was not able to stop. He indicates, for example, that he had to open a post office box, had to get checks made up and had to open a bank account. He said he made the mistake of having the checks mailed to him at the law firm office address rather than at another address.[1] He said there were several weeks in between steps. As he looks back on it, he states, he could have stopped at any point along the way if he chose to do so. He said he became so caught up in the matter that he just felt he was not able to stop.

Dr. Sadoff's report also noted that respondent had been a priest and had agreed to be ordained primarily because he did not want to disappoint his parents' expectations. When he left the priesthood, his pastor told him that, if he could not be faithful to the church, he could not be faithful to anyone and he could not have a successful marriage. According to Dr. Sadoff, respondent had a lot of guilt about his wife, Angela, and about his professional success. As to the reason for respondent's misconduct in this matter, Dr. Sadoff observed in his report:

He said he just cannot explain why he would break the law as he did in order to get this money when he really did not need it. I did ask him what he did with the money, and he said he paid $10,000 for taxes. He said he had an IRA that he could have used if he needed that. He said he also wanted to fix up Betsy's home and that is why he wanted the extra money. He said that way Angela would [not] have been aware of the money that would have been used for Betsy. He states he also wanted to pay off his American Express bill, but that, he said, he could have done by taking money from another account.

With regard to respondent's mental condition, Dr. Sadoff concluded:

I would agree with Dr. Cooke and his diagnoses on Mr. Obringer. I feel very strongly that the major issue here is one of guilt for behavior that Mr. Obringer has expressed. He has guilt for decisions that he has made over many years of his life. He has remembered the statement of his pastor of over 10 years ago, that if he could not be faithful to God, he could not be faithful to himself or to Angela, and his marriage was doomed. Mr. Obringer has lived out that prediction and has destroyed his marriage with Angela. He has had other areas of decision making for which he has felt guilt and for which he sought, unconsciously, punishment.

I would agree that the timing in this case is very important in terms of leaving his wife, taking up with Betsy and the illness of his father, the subsequent death of his father and the development of cancer in Mr. Obringer, reminiscent of the cancer in his mother which led to her death.

Therefore, I would agree that Mr. Obringer committed this act while suffering from the diagnoses noted, i.e., personality disorder, NOS [not otherwise specified], and adjustment disorder, with depressed and anxious mood. These diagnoses, in my opinion, led to a reduced mental capacity that was not a result

---

[1] The checks themselves were sent to respondent at the Audubon post office box; the checking account *statement* s were sent to respondent's law office.

of voluntary use of drugs or other intoxicants. His behavior is clearly related to his feeling of guilt and his need for punishment. Also, it is my opinion, within a reasonable medical certainty, that Mr. Obringer's mental condition or diminished capacity was a contributing factor in the commission of these acts. Clearly, he was not antisocial, has not had a pattern of antisocial behavior in the past and led a very constructive and productive life. I would agree that this is an idiosyncratic event in a relatively long term constructive life of Mr. Obringer. . . .

It is my opinion, also within reasonable medical certainty, that these acts of Mr. Obringer are unlikely to recur, that they were unusual and were an aberration for him, not consistent with his usual method of honest, constructive living.

Respondent pleaded guilty to mail fraud in federal court for his theft of the $20,080 from the Bankruptcy Court registry. He was sentenced to a term of probation; full restitution has been made.

The record establishes by clear and convincing evidence that respondent committed the three ethical violations found by the DRB. He filed fictitious documents with the court consisting of a letter dated February 27, 1996, to Sharon Newman from Ronnie Schwartz of Ciob & Associates with two attachments: a letter dated January 18, 1996, from respondent to Ronnie Schwartz, and a letter dated February 27, 1996, purporting to be an authorization from Equileasing for Ronnie Schwartz to collect funds due from Gaskill. Those documents were sent to induce court staff to transmit to respondent funds to which he was not entitled. Clearly, that conduct violated *RPC* 3.3(a)(1). That same misconduct, coupled with renting a post office box, opening a checking account, and forging endorsements on the two checks sent by the court violated *RPC* 8.4(c). That elaborate scheme was designed to commit a theft of the funds from the court's registry, a clear violation of *RPC* 8.4(b).

Although this case does not involve a knowing misappropriation of clients funds from an attorney's trust account as occurred in *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979), or theft by an attorney from his or her partners as occurred in *In re Siegel,* 133 *N.J.* 162, 627 *A.*2d 156 (1993), the totality of the circumstances makes the theft here at least as egregious as those involved in *Wilson* and *Siegel.*

Respondent became aware of the funds while acting as a trustee in the *Gaskill* bankruptcy matter. He paid the money to the registry in his role as trustee. Equipped with the information that he gained as trustee, he took meticulous steps to perfect his scheme to steal the money only two months after he certified that he had completed his duties as trustee and sought to be discharged. The circumstances make it clear that the theft was not an impulsive act, but rather the result of premeditation. Respondent's elaborate scheme contemplated that this would not be a simple theft such as shoplifting, but one that required respondent to submit false documents to a tribunal in violation of *RPC* 3.3(a)(1) and to otherwise engage in a course of fraud, deceit and misrepresentation to a tribunal in order to steal $20,080 of court-managed funds. Thus, we reject respondent's assertion that this case should be treated as a simple third-degree theft case.

Respondent's reliance on *In re Hoerst*, 135 *N.J.* 98, 638 *A.*2d 801 (1994), is misplaced. There, the Salem County Prosecutor was authorized to obtain funds from a forfeiture account to attend a convention. After receiving the funds he converted them to his personal use. *Id.* at 103–04, 638 A.2d 801. The present case is analogous to a hypothetical situation in which an attorney has made a legitimate withdrawal of money from his or her attorney-trust account and has deposited it with the Clerk of the Superior Court pursuant to Rule 4:57–1. If the attorney thereafter engages in conduct similar to that of respondent in order to obtain the money from the Clerk of the Superior Court as part of an elaborate scheme to steal the money, disbarment would be the only appropriate disciplinary sanction.

Respondent argues in mitigation that disbarment would be the inappropriate sanction because he was having marital difficulties, he was diagnosed with cancer, and his father, who resided in Pittsburgh, Pennsylvania, was very ill and died in August 1996. Respondent does not rely on the expert reports in an attempt to excuse his misconduct as was the case in *In re Jacob*, 95 *N.J.* 132,

469 *A*.2d 498 (1984). He presented the reports only in mitigation of the degree of disciplinary sanction to be imposed.

We reject respondent's mitigation claims for the same reasons stated by the DRB:

[T]he marital difficulties that respondent mentioned consisted of an extra-marital affair that eventually led him to leave his wife for his paramour, Betsy. Respondent told Dr. Cooke that at least part of the misappropriated funds were used to pay credit card bills incurred by purchasing gifts for Betsy and traveling and dining with her. The record reflects that respondent was contemplating using the funds to "fix up" his paramour's home and permits the conclusion that the reason he did not borrow funds against his life insurance policy was that his wife would have been made aware of the loan. Thus, the claimed mitigating factor of marital difficulties hardly presents a sympathetic picture.

Similarly, while there is no reason to doubt that respondent's father suffered from poor health and that such a debilitating illness can take its toll, the record shows that respondent's father passed away in August 1996, six months after respondent wrote the letter to the court requesting payment of the funds. Thus, although a potentially mitigating factor, respondent's father's condition cannot be used as a defense to respondent's misconduct.

Finally, although in May 1996 respondent was diagnosed with cancer of the jaw and underwent several surgeries related to this illness, the disease was, in fact, diagnosed several months after his theft of the funds. As respondent candidly admitted, his physician could not say with any degree of certainty that the cancer contributed in any way to respondent's misconduct. Indeed, Dr. Cooke conceded that respondent's disease was diagnosed after the theft and that "the cancer did not have anything to do with" respondent's misconduct.

Two expert reports alluded to diminished capacity on respondent's part at the time of the theft. Dr. Cooke observed that respondent had engaged in the scheme out of a sense of guilt and that he intended to be caught. Dr. Cooke noted that "the fact that he put this scheme into action one to two days prior to leaving his wife is consistent with an individual who, out of guilt, had an unconscious need to punish himself and committed an act in such a way that would ensure that." However, the record suggests a different scenario. The sole flaw in respondent's otherwise clever plan was to have the checking account statements sent to his law office. If not for respondent's unanticipated illness and resulting unforeseen absence from the office, chances are his law partners would never have discovered the misconduct and respondent's scheme would not have been discovered. Thus, contrary to Dr. Cooke's report, respondent's actions do not appear consistent with those of a person feeling overwhelmed by guilt and desirous of being caught, but instead of a person overcome with greed who wanted to maintain a lifestyle beyond his means.

The record clearly and convincingly establishes that respondent poisoned the well of justice in order to execute his well planned theft. *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A*.2d 45 (1984). His

conduct demonstrates his reckless and flagrant disregard of the rules of professional conduct and "the honor and integrity demanded of a member of the bar." *In re Pennica*, 36 *N.J.* 401, 423, 177 *A.*2d 721 (1962). Respondent chose to engage in serious breaches of the rules of professional responsibility to prevent his wife from becoming aware of his "double life." Because of the egregious nature of his misconduct, respondent's ethical deficiencies are intractable and irremediable. Even assuming that "it is unlikely that [respondent] will repeat the misconduct, certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it." *In re Hughes*, 90 *N.J.* 32, 36–37, 446 *A.*2d 1208 (1982). Here, respondent's misconduct so impugned the integrity of the legal system that disbarment is required.

We, therefore, disbar respondent. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For disbarment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

## ORDER

It is ORDERED that **ROBERT H. OBRINGER** of **MARLTON**, who was admitted to the bar of this State in 1982, is hereby disbarred effective immediately, and it is further;

ORDERED that respondent be restrained and enjoined from practicing law and that he comply with *Rule* 1:20–20, which governs disbarred attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.