753 A.2d 633

IN THE MATTER OF ANGEL R. PENA, AN ATTORNEY AT LAW.

IN THE MATTER OF GLENN M. ROCCA,
AN ATTORNEY AT LAW.

IN THE MATTER OF MICHAEL S. AHL,
AN ATTORNEY AT LAW.

Argued November 29, 1999—Decided May 12, 2000.

*Tangerla Mitchell Thomas,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Anthony P. Ambrosio,* argued the cause for respondent Angel R. Pena (*Ambrosio, Kyreakakis, DiLorenzo, Moraff & McKenna,* attorneys; *Enid W. McDonough,* on the brief).

*Eric A. Summerville,* argued the cause for respondent Glenn M. Rocca (*Summerville, Radding & Campbell,* attorneys).

*Joseph P. Castiglia,* argued the cause for respondent Michael S. Ahl (*Mr. Castiglia* and *Pashman Stein,* attorneys).

PER CURIAM.

Respondent Angel Pena was admitted to practice law in New Jersey in 1984. Respondents Glen M. Rocca and Michael S. Ahl were admitted to practice law in New Jersey in 1983. All three respondents were partners in a law practice at all times relevant to these disciplinary proceedings. The respondents maintain law offices in Fort Lee and Union City. Courtney Krause and Costantino Santorella, the grievants, and the trial judge who presided over a related civil case, brought the matters to the attention of the Office of Attorney Ethics.

District VI Ethics Committee filed a complaint alleging that respondents had violated *RPC* 8.4(c), which prohibits "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." The complaint alleged that respondents concealed the interests of Santorella and Krause in a liquor license and bar business known as "Good N'Plenti" through their corporation, Hoboken Fun Place, Inc., because the New Jersey Division of Alcoholic Beverage Control (ABC) had prohibited Santorella's and

Krause's involvement in the business based on Santorella's prior criminal conviction.

The disciplinary hearings were conducted by a Special Master. During those proceedings, respondents stipulated that the trial transcripts and exhibits of the related non-jury civil matter conducted before Judge D'Italia should be considered as evidence. The only witnesses to appear before the Special Master were respondent Pena and Diane Bisogni, the owner of a bar in the Osprey Hotel in Brielle, New Jersey. Respondents Rocca and Ahl attended with counsel, but chose not to testify or otherwise present evidence. The two grievants also elected not to testify but to rely on their trial testimony presented in the civil matter.

The Special Master found that all three respondents had violated *RPC* 8.4(c) and recommended that each be suspended from the practice of law for two years. The Disciplinary Review Board (DRB) sustained the Special Master's findings, based on its independent review of the record. In addition, the DRB found that respondents had violated *RPC* 8.4(d), "conduct . . . prejudicial to the administration of justice." It was recommended that respondent Pena be disbarred, that respondent Rocca be suspended for three years, and that respondent Ahl be suspended for two years.

██ Our obligation in an attorney disciplinary proceeding is to conduct an independent review of the record, *R.* 1:20–16(c), and determine whether the ethical violations found by the DRB have been established by clear and convincing evidence. *In re DiMartini*, 158 *N.J.* 439, 441, 730 *A.*2d 346 (1999). Our review of the record leads us to conclude that respondents' violations of *RPC* 8.4(c) and *RPC* 8.4(d) were clearly and convincingly established.

I.

In 1976 Constantino "Gus" Santorella was disqualified from participation in the alcohol beverage control industry by virtue of a federal conviction for conspiracy to steal from foreign shipments. Despite Santorella's disqualification, in 1986 he acquired, through

an entity known as "DGD", the assets of a bar, Ruben's Café, and arranged to obtain a liquor license through his son, Charles. The business was operated as Good N'Plenti, located at 99 Washington Street, Hoboken, New Jersey. Initially, the building was leased but Gus Santorella and his live-in girlfriend, Courtney Krause, purchased the 99 Washington Street property in 1989 for $375,000. Krause became the sole owner in 1991, while Santorella remained obligated on the mortgage. Following a dispute with his son in 1989, Gus Santorella arranged to have the liquor license surrendered to the City of Hoboken as abandoned. Krause then obtained a new license in 1989 in the name of 99 Washington Street, Inc. Although Krause was listed on the license as the sole shareholder of 99 Washington Street, Inc., Santorella had an equity interest in the business and made most of the business decisions. Because of Santorella's continued involvement, the ABC suspended Krause's license indefinitely in 1992 pending a transfer of the license to a *bona fide* purchaser. The order of suspension was stayed pending an appeal to the Appellate Division.

By the time Krause and Santorella placed the tavern business and the building in which the business operated on the market, Santorella's son Charles had filed suit against his father seeking to reacquire the license to the bar business. To minimize the effect of that suit on a potential sale, the trial court entered an order permitting Krause to negotiate a sale of the license held by 99 Washington Street. The order provided that no contract could be effective without notice to Charles and the court, and that any contract had to be subject to the outcome of the litigation.

The asking price for the bar business was $350,000 with an additional price in excess of $400,000 for the real estate. When all other offers failed to materialize, respondents became involved in a purchase arrangement beginning in 1992 that spawned the present disciplinary matters.

Respondents became aware that the bar business was for sale through their patronage of Good N'Plenti and in a meeting that

respondent Pena had with Gus Santorella in a federal court in late 1992. Respondents expressed an interest in the bar business but were only able or willing to spend $150,000. An agreement was finally negotiated on April 18, 1993 in respondents' office in Union City that was attended by Santorella and respondents Pena and Rocca. Under the agreement struck, respondents would spend $150,000 for a one-half interest in the bar business. The agreement was that the parties would project to the rest of the world, through a sham contract of sale, that 100% interest in the bar business was purchased in the name of Hoboken Fun Place, Inc., a New Jersey corporation, for $110,000.

In addition, a sham lease from 99 Washington Street to Hoboken Fun Place also would be executed. The contract of sale and the lease forms were reused documents, prepared by someone other than the respondents, on which they had whited-out identifying language. The agreement further contemplated that Krause would continue to be involved in the business as a purported non-equity salaried manager, thereby enabling her to function as Santorella's "eyes and ears." To effectuate the deal, the only documents executed reflected a sham closing on a sale of the business to respondents' new business, Hoboken Fun Place, Inc., for $110,000. The whited-out documents were designed to show a transfer of the license away from Krause and Santorella to Hoboken Fun Place, Inc., and a complete divestiture of their interest. In reality, respondents would pay $110,000 in checks and an undocumented $40,000 in cash to Santorella and Krause. Notwithstanding their assertion that $110,000 was paid for the legitimate purchase of 100% interest in the business, respondents performed absolutely no investigation, such as examining the books and records of the business, to attempt to ascertain the true value of the business. Notably, respondent Ahl had some experience in representing clients purchasing liquor businesses and was aware of the standard procedure in such transactions and the information typically investigated.

Although the purchase was agreed upon in April of 1993, the contract of sale was not executed until August 1993 when respondents had to produce a signed contract for the New Jersey State Police investigating the transfer of the license. When the Appellate Division on June 14, 1993 affirmed the ABC Director's order, the stay of suspension was lifted and the need for Krause to transfer the liquor license became even more urgent. The suspension took effect when the Appellate Division rendered its decision.

When the bar business was closed in June 1993, following the affirmance by the Appellate Division, the trial judge in the litigation between Santorella and his son granted permission for the contract of sale to be executed. In July of 1993 respondents submitted to extensive interviews by the New Jersey State Police and the ABC Enforcement Unit concerning the proposed transfer. During that time respondents represented that they were the only persons who were to have any interest in the license and, inferentially, that the transfer represented a complete divestiture of Krause's interest in the bar business. They informed the ABC that Krause's role would be limited to managing the business for one year. Krause signed the contract of sale on August 4, 1993.

On October 12, 1993, the City of Hoboken Board of Alcohol and Beverage Control transferred the license from 99 Washington Street to Hoboken Fun Place, Inc. The next day, October 13, 1993, a closing of the transaction contemplated by the contract of sale allegedly occurred at the law offices of respondents. The contract purported to require respondents, through Hoboken Fun Place, Inc., to pay $35,000 at the closing and $75,000 in thirty-six equal monthly installments reflected by a promissory note. No executed promissory note, however, was ever produced. At the closing on October 13, 1993, respondents paid the full $110,000: $36,300 to the Director of the ABC, as a compromise of the fines then due in order to lift the indefinite suspension, and the balance directly to Krause's 99 Washington Street, Inc.

The method of payment at the closing was convoluted, in an attempt to conceal the true arrangement. Respondents claimed

that they were uncomfortable paying the seller directly and disbursing the purchase price through their attorney trust account, in part because the transaction was being scrutinized. Consequently, they called in an attorney from an adjoining office who passed the checks to the ABC and 99 Washington Street, Inc. through his trust account. That attorney did not represent Krause, Santorella, or 99 Washington Street, Inc. Significantly, neither Krause nor 99 Washington Street, Inc. was listed on the bill of sale.

Because Krause still owned the real estate in which the liquor business was operated, respondents required a lease of the premises. A form of lease was provided by Krause that was prepared by an attorney for another proposed buyer. Krause gave it to respondent Rocca with the names redacted. The lease called for monthly payments of $3,000 for the first year, $3,500 per month for the second year, and thereafter an annual adjustment for the remainder of the fifteen-year term based upon cost of living increases.

On October 12, 1993, one day after the Hoboken ABC transferred the license to Hoboken Fun Place, Inc., the State ABC lifted its suspension of the license. The bar reopened for business October 14, 1993 under the name "Good N'Plenti." After the reopening, Krause continued to act as the general manager, assuming responsibilities that included, among other things, making deposits into the corporate bank account and issuing business checks using a stamp of respondent Rocca's signature. Krause continued as the manager until a falling out occurred between her and respondents.

When problems developed regarding Krause's management style, Santorella included an additional fax to the weekly fax sent to respondents' Fort Lee office for the week ending May 1, 1994, which referred to the strained relationship and demanded that Krause continue to run the operation. Santorella's fax further stated that if respondents had a problem with the original agreement, they were to call, meet or buy Santorella out. That fax, along with the weekly profits fax sent by Santorella to respon-

dents, corroborated Santorella's testimony that his relationship with respondents was hardly casual, but was in fact that of a partner. After receipt of that fax, respondents refused to make any more payments to Krause or Santorella. Krause was fired on August 13, 1994. That chain of events led to the filing of the litigation that resulted in a non-jury trial before Judge D'Italia, and the present disciplinary matter.

Judge D'Italia described the litigation before him in the following manner:

> This is a most unusual case in that plaintiffs invoke the jurisdiction of Chancery to enforce the terms of an oral agreement which constitutes a conspiracy to violate the alcoholic beverage control laws of this state and is specifically designed to evade the terms of an order entered by the Director of the Division of Alcoholic Beverage Control. The dispute involves ownership of a bar business operated under the trade name Good N'Plenti at 99 Washington Street in Hoboken, New Jersey.

One of the issues raised in the civil trial was the amount of profit the business generated between October 19, 1993 and August of 1994. Santorella and Krause maintained that the business generated more than $200,000 in profit for the forty-four week period involved, with half of the profits being paid to respondents in cash. Respondents, on the other hand, deny that they made $100,000, contending that the bar generated relatively little profit. Santorella faxed respondents a weekly earnings statement and a calculation of the profits. He paid respondents each week in cash. Respondent Rocca testified in the civil proceeding that he did not know how much the business yielded during the relevant time, but estimated that respondents netted approximately $24,000 collectively. Judge D'Italia found that Santorella's records were the most compelling evidence of respondents' "complicity in a scheme to dupe the ABC."

The trial court also found that respondents had made an oral agreement with Santorella and Krause that they would own an "undisclosed 50% equity interest in the Hoboken Fun Place, Inc. and the business it operates as Good N'Plenti.... That contract violates public policy and results in an illegal agreement.... The agreement was entered into to thwart *N.J.S.A.* 33:1–25, to evade

the divestiture order of the Director of the ABC and perpetuate a fraud on the ABC Board of the City of Hoboken and the State of New Jersey." That statute precludes individuals convicted of a crime involving moral turpitude from becoming a licensee or from owning more than ten percent of the stock of a corporate licensee.

The Special Master found that the District Ethics Committee had established by clear and convincing evidence that respondents had an agreement with Santorella and Krause whereby respondents represented to two governmental authorities that their entity, Hoboken Fun Place, Inc., owned 100% of the liquor and bar business located at 99 Washington Street, known as Good N'Plenti, when in fact the respondents had entered into an agreement with Santorella and Krause in which respondents held only 50% interest in the business.[1]

The Special Master also found that "Respondents knowingly acted in concert from the outset of this matter to conceal their partnership arrangement with Santorella and Krause from the State ABC, State Police and City of Hoboken in order to thwart the ABC Director's decision to compel Krause to transfer the liquor license and divest herself, and thereby also Santorella, from any interest in, or influence over, the Good N'Plenti bar business." The Special Master concluded that "Respondents deliberately engaged in fraud, dishonesty and misrepresentations to ... thwart *N.J.S.A.* 33:1–25 by evading the divestiture order of the ABC Director and to perpetuate a fraud ... in violation of *RPC* 8.4(c)."

## II.

The DRB, upon *de novo* review, was convinced by clear and convincing evidence that respondents were guilty of unethical conduct by their concealment, in the face of overwhelming evidence, that Santorella and Krause were their partners in the Good N'Plenti. The purpose of the concealment of Santorella's and

---

[1] The Special Master found that the testimony of Pena, the only respondent to testify, was lacking in credibility.

Krause's interest in the partnership was to thwart *N.J.S.A.* 33:1–25, evade the divestiture order of the State ABC, and perpetuate a fraud on the State ABC, the Hoboken ABC, and the State of New Jersey. Although respondents were not charged with violating *RPC* 8.4(d) (conduct prejudicial to the administration of justice), nonetheless, the DRB found that their conduct had clearly and convincingly violated that rule.

The DRB found that the record revealed that respondents had filed a petition with the ABC in which they represented that they were *bona fide* purchasers. Respondents also misrepresented to the ABC Enforcement Unit of the State Police that they were purchasing the license in an arms-length transaction and that Krause would be completely divested of any interest in the license. The DRB further found that although the complaint did not specifically charge a violation of *RPC* 8.4(d), charging only a violation of *RPC* 8.4(c), the complaint generally placed respondents on sufficient notice of alleged improper conduct that was potentially also a violation of *RPC* 8.4(d). Indeed, respondents stipulated to the admission of evidence presented in the civil trial that was probative of conduct prejudicial to the administration of justice. Respondents testified in the civil trial; the trial judge found that they lied under oath. The DRB, therefore, amended the complaint to conform to the proofs in accordance with *In re Logan,* 70 *N.J.* 222, 232, 358 *A.*2d 787 (1976). We fully agree with the DRB that there is clear and convincing evidence that respondents violated *RPC* 8.4(c) and *RPC* 8.4(d).

The DRB also concluded that, although respondents lied under oath repeatedly during the trial before Judge D'Italia, the complaint did not contain a sufficient allegation to place respondents on notice that perjury could be part of the ethics proceeding. The DRB found that respondent Pena suborned perjury when he conducted the direct examination of Rocca and Ahl, and that Rocca suborned perjury when he conducted the direct examination of Pena during the civil trial. However, the DRB concluded that

such evidence of perjury and subornation of perjury could be considered as an aggravating factor.

### III.

Next, we focus on the appropriate discipline to be imposed. Pena, who was the only respondent to testify in these proceedings, offered mitigation evidence. He testified that he had served as a municipal prosecutor, a township attorney, and as a member of the board of directors of a drug and alcohol rehabilitation center. He also stated that he did *pro bono* work for an AIDS clinic and was involved in coaching little league baseball. Rocca submitted a certification to the DRB regarding his *pro bono* work as a municipal prosecutor and his voluntary service in a community association. Similarly, Ahl submitted a certification and documentary evidence to the DRB regarding his volunteer service with a fee arbitration committee and early settlement panels, along with letters attesting to his good character. Ahl also argued that he should receive a lesser penalty than his partners because of his lesser involvement in running the business.

In *In re Kornreich*, 149 *N.J.* 346, 693 *A.*2d 877 (1997), an attorney was found guilty of obstructing justice when the attorney was involved in a minor automobile accident, she denied having been at the scene, lied to the police and the prosecutor, and implicated her babysitter as the driver of her automobile. Throughout the ethics proceeding, Kornreich refused to admit that she was the driver of the automobile. The Court suspended her for three years; two members of the Court voted to disbar her. Here, unlike *Kornreich*, there is no innocent victim whom respondents attempt to blame. Also, unlike *Kornreich*, respondents cannot claim youth and inexperience as mitigating factors. When this conduct occurred in 1993, Rocca and Ahl had been practicing law for ten years and Pena for nine. Furthermore, Pena and Rocca received private reprimands in early 1993, within the same time frame as their initial agreement with Santorella.

Additionally, on October 22, 1999 this Court suspended Pena for six months for a violation of *RPC* 1.7(b). *In re Pena*, 162 *N.J.* 15, 26–27, 738 *A.*2d 363 (1999). That suspension dealt with conduct that started in 1984 and ended in 1991, less than one year before commencement of the unethical conduct presently involved.

*In re Yaccarino*, 117 *N.J.* 175, 185–86, 564 *A.*2d 1184 (1989), held that it is unethical for an attorney to conceal the identity of all the owners of a corporate licensee of a bar. *N.J.S.A.* 33:1–25 compels disclosure concerning investments in liquor licenses. Hence, respondents had a duty to comply with the statutory disclosure requirements and not attempt to circumvent the statute through fraud, deceit, misrepresentation, concealment, or with-holding information. *Yaccarino, supra,* 117 *N.J.* at 199, 564 *A.*2d 1184. Respondents' concealment and actual misrepresentations are "inconsistent with the professional obligation of an attorney, who 'should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice.'" *Ibid.* (quoting *In re Howell,* 10 *N.J.* 139, 140, 89 *A.*2d 652 (1952)). The public is entitled to protection from attorneys who have engaged in conduct that is patently offensive to the elementary standards of a lawyer's professional duty.

We are persuaded that because Pena and Rocca are recidivists and because they have demonstrated that they have no compunction about lying to a court or a licensing agency and engaging in conduct involving fraud, deceit, dishonesty and misrepresentations before a court and licensing regulatory agency their misconduct warrants substantial sanctions. The misconduct of respondents Pena and Rocca is aggravated by perjury and the subornation of perjury in their representation of a fellow respondent during the civil trial. Their unethical conduct further demonstrates their reckless and flagrant disregard of the rules of professional conduct "and the honor and integrity demanded of a member of the bar in the practice of law." *In re Pennica,* 36 *N.J.* 401, 423, 177 *A.*2d 721 (1962). Throughout the civil trial and the

DRB hearing, respondents steadfastly refused to admit their wrongdoing and to show any morsel of contrition. They persisted in their dishonesty, concealment, misrepresentation, and fraud, and in so doing, have demonstrated their contempt for the administration of justice. "Because such ... transgression[s] directly subvert and corrupt the administration of justice," respondents Pena and Rocca have poisoned the well of justice. *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984). They are therefore disbarred.

As to respondent Ahl, he did not act as attorney for either respondent and therefore did not have his unethical conduct aggravated by suborning perjury. He also has no prior disciplinary history. The record also permits the conclusion that his involvement in operating the liquor business was not as extensive as that of his co-respondents. Furthermore, his mitigating evidence of volunteer service, with a fee arbitration committee and early settlement panels, persuades us that he still has some redeemable aspects left in his character. We conclude that the appropriate discipline for Ahl is a three year suspension.

Respondents are also ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

O'HERN, J., dissenting in part.

I disagree with the Court's determination to disbar respondents Angel Pena and Glenn Rocca. I have reached this conclusion by traveling a different route than the other members of this Court. My reasoning is set forth in my concurring opinion in *In re Litwin*, 104 *N.J.* 362, 370, 517 *A.*2d 378 (1986).

When I joined the Court in 1981, one of the most difficult cases of that term was *In re Hughes*, 90 *N.J.* 32, 446 *A.*2d 1208 (1982). Hughes had been unable to clear up a federal tax lien on real estate in his father's estate. To save his mother embarrassment, he offered a bribe to a federal agent to secure a release of the tax lien. Justice Schreiber dissented from the Court's decision disbarring Hughes. *Id.* at 39, 446 *A.*2d 1208. I joined his opinion. I

believed that the Court had no consistent set of principles to guide it to the result in that case. *In re Sears*, 71 *N.J.* 175, 364 *A.*2d 777 (1976) was on the books. Sears had been convicted of attempting to influence a Federal Securities and Exchange Commission investigation and had received a suspension. I believed that our disciplinary system should have consistent principles for decision.

I [thus] dissented from the Court's imposition of a suspension in *In re Infinito*, 94 *N.J.* 50, 462 *A.*2d 160 (1983) [a case involving the misuse of funds of a ward], because I could not find a satisfactory basis to distinguish that case from *In re Hughes*, 90 *N.J.* 32, 446 *A.*2d 1208 (1982), in which the Court disbarred an attorney for conviction of a crime of dishonesty.

I believed at the time *In re Infinito, supra*, was decided that the Court should have a consistent principle that would require disbarment of attorneys convicted of crimes of the first or second degree, or crimes involving acts of dishonesty. *See R.* 1:20–6 (calling for automatic temporary suspension of attorneys convicted of serious crimes, which are defined as crimes of the first or second degree or those involving dishonesty).

I rejoined the majority in *In re Verdiramo*, 96 *N.J.* 183, 475 *A.*2d 45 (1984), because I believed the Court had stated a new principle of law, applicable to cases arising after that date, that conviction of serious crimes, especially those involving dishonesty, would almost invariably warrant disbarment.

[*Litwin, supra*, 104 *N.J.* at 370, 517 *A.*2d 378.]

I.

Verdiramo had prompted a witness to lie before a grand jury and had pled guilty to influencing a witness. In *Verdiramo*, the Court expressed clearly the principle that certain crimes that "poison the well of justice" will almost invariably require disbarment. 96 *N.J.* at 186, 475 *A.*2d 45. Over a long period of time thereafter, the Court developed a consistently principled system of administering discipline in cases involving dishonesty. Criminal convictions that taint the administration of justice or involve public corruption or fraud on the marketplace will generally result in disbarment. Examples of such discipline are *In re Obringer*, 152 *N.J.* 76, 703 *A.*2d 895 (1997) (making false statement to tribunal, engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation, and stealing of funds from court registry, which was crime reflecting adversely on his fitness as attorney, warrant disbarment); *In re Jones*, 131 *N.J.* 505, 621 *A.*2d 469 (1993)

(soliciting bribe while a public official for his own personal gain as prohibited by law warrants disbarment); *In re Messinger,* 133 *N.J.* 173, 627 *A.*2d 162 (1993) (convictions on several serious federal charges involving income tax fraud for purposes of advancing complex criminal scheme warrants disbarment); *In re Zauber,* 122 *N.J.* 87, 583 *A.*2d 1140 (1991) (conviction of Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy and soliciting kickbacks in connection with employee benefit plan and pleading guilty to obtaining controlled dangerous substances by fraud or misrepresentation and to forgery warrants disbarment); *In re Conway,* 107 *N.J.* 168, 526 *A.*2d 658 (1987) (participating in conspiracy to secure dismissal of criminal prosecution by bribing witness warrants disbarment); *In re Tuso,* 104 *N.J.* 59, 514 *A.*2d 1311 (1986) (convictions for conspiracy to commit bribery and solicitation of misconduct and two counts of offering bribe warrants disbarment); *In re Surgent,* 104 *N.J.* 566, 518 *A.*2d 215 (1986) (conspiracy to commit theft by deception and fourteen felony offenses including conspiracy, stock fraud, sale of unregistered securities, and subornation of perjury warrants disbarment); *In re Friedland,* 95 *N.J.* 170, 470 *A.*2d 3 (1984) (federal felony criminal convictions warrants disbarment).

## II.

None of the attorneys in this case has been charged with or convicted of a crime. Consequently, the principles established in the cases that followed *Verdiramo* do not, strictly speaking, apply. Moreover, not every crime of dishonesty results in disbarment. For example, in three instances public prosecutors who were guilty of acts of dishonesty were not disbarred. *See In re Asbell,* 135 *N.J.* 446, 640 *A.*2d 837 (1994) (staging assassination attempt on his own life and filing false police report in attempts to obtain reappointment as county prosecutor warrants two-year suspension); *In re Hoerst,* 135 *N.J.* 98, 638 *A.*2d 801 (1994) (conviction for third-degree theft resulting from misuse of forfeiture funds to pay for himself and companion to attend out-of-state convention

and three day side trip warrants six-month suspension); *In re Farr,* 115 *N.J.* 231, 557 *A.*2d 1373 (1989) (removing marijuana and PCP from evidence locker of prosecutor's office and providing it to others warrants six-month suspension in addition to voluntarily served suspension). Those attorneys were not disbarred, not because what they did was not wrong, but because their conduct did not poison the well of justice or demonstrate irredeemable flaws of character.

Other crimes or acts of dishonesty have not resulted in disbarment. *In re Giordano,* 123 *N.J.* 362, 587 *A.*2d 1245 (1991) (conviction of attempted tampering with public records warrants three-year suspension when considered with lack of any evidence of criminal conspiracy); *In re Youmans,* 118 *N.J.* 622, 573 *A.*2d 899 (1990) (conduct, consisting of misrepresentation and deceit, fraud, gross negligence, and failure to keep client funds separate, warrants two-year suspension); *In re Stier,* 108 *N.J.* 455, 530 *A.*2d 786 (1987) (disorderly persons offense of tampering with public records by making false entry in public records warrants one-year suspension, suspended with probation); *In re Kotok,* 108 *N.J.* 314, 528 *A.*2d 1307 (1987) (conflict of interest warrants one-year suspension; false statement on bar application justifies conditional or provisional revocation of attorney's license; inaccurate disclosure on application to purchase handgun warrants public reprimand; where attorney's conduct in engaging in conflict of interest and making false statement on bar application occurred over ten years ago, during which time attorney demonstrates commendable record, warrants one-year suspension and conditional revocation of license, placement on probation for one year, with condition that attorney perform legal services of community nature; and making of inaccurate gun purchase permit application by judge warrants public reprimand and remand to advisory committee on judicial conduct); *In re Kushner,* 101 *N.J.* 397, 502 *A.*2d 32 (1986) (filing by lawyer of false certification to induce court to grant relief for his benefit warrants three-year suspension); *In re Yacavino,* 100 *N.J.* 50, 494 *A.*2d 801 (1985) (repeatedly misrepresenting status of uncomplicated, pending adoption proceeding to clients and prepar-

ing two false court orders to stall client's discovery of deficiencies warrants three-year suspension); *In re Labendz*, 95 *N.J.* 273, 471 *A.2d* 21 (1984) (knowing participation in attempt to perpetrate fraud upon federally insured savings and loan association to obtain mortgage for client warrants suspension for one year).

## III.

How do the cases of respondents fit within this precedent? There is no revisiting the facts. Defendants lost the battle of the facts. (Actually it was a battle of faxes.) These were not nice people with whom respondents fell in. Constantino Santorella is a convicted felon, found guilty in 1976 of conspiracy to steal from foreign shipments for which he is now prohibited from holding any interest in a liquor license. Nevertheless, he has twice covered up his interests in the liquor business at 99 Washington Street, first using his son Charles as a cover, then his girlfriend, Courtney Krause. It was she who sold the business to respondents.

The trial court in the underlying civil action, characterized the credibility of Santorella and Krause as follows:

[Santorella] testified in this action that he was the sole owner. Santorella wrote to the Director of the ABC on April 29, 1991 requesting reinstatement of a work permit. That application contained numerous false statements. He testified in this court that he had been running Good & Plenti through Krause since April of 1989 and failed to disclose that to the Director. Santorella testified in this court that he gave testimony before an Administrative Law Judge that he had no interest in Good & Plenti. Santorella stated in this court that his prior testimony was a lie. He acknowledged that he and Krause were in a conspiracy to purchase a liquor license for an establishment called "Brokers" in which he would have had a secret interest. Santorella acknowledged that in an action for divorce filed by his former wife he and Krause, who was named as a correspondent, answered interrogatories and submitted affidavits which falsely asserted that he had no interest in Good & Plenti. It is not clear that Santorella filed any tax returns which reported income from his secret interest in bar businesses dating back to 1985. According to the weekly financial reports, the defendant and plaintiffs each netted more than $100,000.00 in cash during the period of joint operations from October 1993 to August 1994. Santorella claims that he filed an amended return during this law suit to report his 1993 cash earnings.

Krause has undoubtedly given as many false statements, under oath and otherwise as Santorella. If their testimony before this court is to be believed, Krause has filed false liquor license applications and renewals annually since 1989

and she has testified falsely in administrative hearings related to Santorella's interest in the license. In this proceeding she has acknowledged that Santorella put her in the business-meaning Good & Plenti, that it was his business and that he controlled the corporate account despite the fact she was the only person appearing on the papers. She is complicit in a conspiracy to defraud Santorella's ex-wife in connection with the latter's claim for equitable distribution. Krause apparently has interests in other liquor licenses, including one recently granted to her in Jersey City. Certainly her testimony before this court ought to be sufficient basis for a revocation of that license. Whether the ABC can keep Santorella and Krause out of the liquor business is problematic. The[y] are apparently committed to and quite able to find shills and fronts to advance their economic interests.

When a disagreement arose concerning respondents' choice of employees to run the business, Krause and Santorella did not react gracefully. The Special Master wrote: "She [Krause] was sitting at the bar with friends of hers and Santorella, one of whom threw Chenard [the employee] through a door out of the bar." Unable to credit the testimony of Krause, Santorella, or their associates,[2] the Law Division and the Special Master each found the most compelling evidence of respondents' complicity in a series of financial reports that Krause and Santorella prepared weekly and faxed to respondents. Each sheet recorded "net sales" less certain cash payments made by Krause during the week for business expenses. Other figures recorded on the sheet were the amount to be deposited in the corporate bank account to cover expenses to be paid by check. Net sales less the deposits equaled "net profit" that were shown to be divided equally. The deposits recorded on those sheets tallied with the deposits recorded on the bar's bank statements, copies of which were obtained from the bank.

Respondents claimed that this was an elaborate scheme of substituting these dummied-up reports for other faxed reports

---

[2] In addition, two attorneys involved with Santorella and Krause have since been disciplined for ethical improprieties. Thomas DeLuca, who represented complainants Santorella and Krause in the trial before Judge D'Italia, was disbarred, 152 *N.J.* 59, 703 *A.*2d 268 (1997), and James Lisa, Santorella's personal attorney and friend, who testified for him in the trial, has been suspended for three months for a criminal infraction. 152 *N.J.* 455, 705 *A.*2d 1213 (1998).

that were concocted by Santorella and Krause to extort money from them. The tribunals below found that the records were much too detailed to be a recent fabrication by Santorella and Krause for the sole purpose of establishing their claims. The single most compelling piece of evidence was a reply fax from Rocca to Santorella with a handwritten memo on one of the weekly reports.

## IV.

I believe that the Disciplinary Review Board (DRB) voted to disbar Pena because it believed him guilty of a pattern of dishonest conduct. Recall that the DRB had found Pena guilty of fraud in a sale of real estate to his close friends and recommended an eighteen month suspension. This Court found that, although there may have been a conflict of interest, there was not fraud. *In re Pena*, 162 *N.J.* 15, 738 *A.*2d 363 (1999).

The individual respondents do not differ greatly from Chen Kornreich, an attorney who came much closer to poisoning the well of justice. The Court found her to be young, susceptible, and capable of rehabilitation. *In re Kornreich*, 149 *N.J.* 346, 693 *A.*2d 877 (1997). Respondents were at the time of the events relatively young, and I believe susceptible. I do not believe that they are beyond rehabilitation. I find it difficult, then, to see what is so distinct about their conduct that merits disbarment. Recall that in *Kotok* and *Giordano* the attorneys involved were found to have falsified public records and yet were not disbarred.

What is to be feared is that the Court will revert to the *ad hoc* decision making that once characterized attorney discipline. If the Court intends to announce now a rule of invariable application that falsification of public records that is repeated will automatically result in disbarment, it should do so. I would not wish that to be the rule, but I believe that the Court should, in fairness, have consistent principles of decision.

We have ordinarily not disbarred attorneys unless the attorney's conduct is so "immoral, venal, corrupt or criminal as to

destroy totally any vestige of confidence that the individual could ever again practice in conformity with the standards of the profession." *In re Templeton,* 99 *N.J.* 365, 376, 492 *A.*2d 1001 (1985). We thus reasoned in *Farr, supra,* that when the cause of ethical transgressions seems to be " 'some mental, emotional, or psychological state or medical condition that is not obvious and . . . could be corrected through treatment,' " the respondent "need not be disbarred to preserve confidence in the bar or to protect the public." 115 *N.J.* at 237, 557 *A.*2d 1373 (quoting *Templeton, supra,* 99 *N.J.* at 374, 492 *A.*2d 1001). (That exception, however, does not apply to the knowing misappropriation of funds. *In re Skevin,* 104 *N.J.* 476, 517 *A.*2d 852 (1986)). In this case, the circumstances do not unerringly point to a conclusion that respondents have an utterly "unsalvageable professional character," or are utterly "beyond the pale of professional rehabilitation," the traits that call for disbarment. *Templeton, supra,* 99 *N.J.* at 376–377, 492 *A.*2d 1001.

One of the reasons proffered by the Court for disbarment is the allegation that Pena suborned perjury and Rocca compounded that perjury through his testimony. None of respondents, individually or collectively, were ever charged with suborning or committing perjury. It is utterly unfair to base disbarment on allegations not even charged, much less proven. The only count in the Ethics complaint charged respondents with violating *R.P.C.* 8.4(c), which prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation in that they knowingly participated in a sham designed to conceal from licensing authorities Santorella's continuing interest in the bar business. They told their side of the story. The other side was believed. Did they delude themselves into believing that Krause was a manager and that Santorella was only in the background?

Finally, I simply do not see how one can explain to the families of Rocca and Pena why it is that their partner, Ahl, has been spared and not they. The Special Master found that the three had "acted in concert." He wrote:

I conclude that Respondents knowingly acted in concert from the outset of this matter to conceal their partnership arrangement with Santorella and Krause from the State ABC, State Police and City of Hoboken in order to thwart the ABC Director's decision to compel Krause to transfer the liquor license and divest herself, and thereby also Santorella, from any interest in, or influence over, the Good N' Plenti bar business.

It is most significant to me that the Office of Attorney Ethics (OAE) did not believe that disbarment was the appropriate discipline for Rocca. When Rocca petitioned to review the DRB's determination to suspend him for three years, the OAE did not file a cross-petition. Instead, in reply to Rocca's petition it wrote that "after discussing relevant case law ... the [Disciplinary Review] Board determined that the appropriate discipline for respondent Glenn M. Rocca is a three-year suspension. The Office of Attorney Ethics respectfully submits that *the Board's findings should not be disturbed."* (Emphasis added).

In my judgment, the Special Master is the person closest to this case. He studied the entire transcript of the civil action and, in addition, conducted the hearings in the disciplinary action. His sense of the parties and of the proper resolution of this matter is the most just. In his report he wrote:

I have carefully reviewed and considered the evidence and have concluded that Respondents' conduct constitutes ethical misconduct. As a result of the foregoing, I must recommend specific discipline.

I have considered the testimony and evidence presented. I have also considered evidence submitted in mitigation by Angel Pena at the Ethics Committee hearing wherein Mr. Pena testified to his civic involvement and his unblemished record. I have requested and received from the Office of Attorney Ethics a report on each Respondent. It appears that there was one other disciplinary matter involving Mr. Rocca in 1992, when he received a private reprimand (the equivalent of an admonition), but none against Mr. Pena or Mr. Ahl. At the same time, I received no evidence nor have I considered any evidence in mitigation with respect to Messrs. Ahl and Rocca.

Besides Respondent Rocca's prior disciplinary problem I find numerous facts in aggravation of the charges submitted against Respondents. First, although the specific charge against them is entering into an agreement for the purpose of thwarting a State statute, evading a divestiture order of the Director of the ABC and perpetrating a fraud on the ABC Boards of the City of Hoboken and the State of New Jersey, my finding that such an agreement existed necessarily leads to the obvious conclusion that Respondents, being well aware of the agreement they entered into with Santorella and Krause, lied about that interest before the State

Police, the Division of Alcoholic Beverage Control, the City of Hoboken, Judge D'Italia in the underlying trial and, as to Mr. Pena, before this Committee. In addition, while Messrs. Ahl and Rocca did not testify, they submitted answers which denied the material allegations of the complaint and therefore I consider that action as having been taken in obstruction, rather than in furtherance, of this Committee's investigation. (See R.P.C. 8.1.) Although these are not charges that were lodged and for which a recommended discipline can be imposed, they are certainly matters that must be considered in aggravation of the charges lodged against Respondents. *See Matter of Kornreich, supra,* 149 *N.J.* at 364, 693 *A.*2d 877 to 68 (continued denial of guilt and misrepresentations to municipal court and Ethics Committee; no admission of guilt).

This matter is obviously of the utmost seriousness. It is not an ethical violation that may have been inadvertent; this is knowing misconduct. Respondents have apparently not been charged with a crime. Their conduct was not directly related to the practice of law; moreover, their accusers, grievants Santorella and Krause, are hardly blameless. However, the true victims in this matter are the governmental entities defrauded and, through them, the public at large. Moreover, Respondents were not only engaged in dishonesty with respect to State and local bodies, they also appeared as officers of the court at the trial of the underlying action where they gave false testimony. In addition, Respondents Pena and Rocca apparently suborned perjury in connection with conducting direct examination of their other partners at the underlying trial.

At the conclusion of the ethics hearing, I asked both sides to brief appropriate discipline in this matter, including citing me to precedent to assist me in connection with this determination. I have also done independent research on the issue. I conclude that the following cases appear to deal with analogous situations: *Matter of Kornreich, supra,* (lying about involvement in accident in municipal court and to Ethics Committee; no contrition; multi-year suspension); *Matter of Asbell,* 135 *N.J.* 446, 640 *A.*2d 837 (1994) (concocting phony assassination attempt and lying to police; two year suspension); *Matter of Silverman,* 113 *N.J.* 193, 549 *A.*2d 1225 (1988) (false statements under oath) (six year suspension); *Matter of Kushner,* 101 *N.J.* 397, 502 *A.*2d 32 (1986) (filing of false certification to induce court to grant relief; three year suspension in light of extensive mitigating evidence); *In re Labendz,* 95 *N.J.* 273, 471 *A.*2d 21 (1984) (knowing submittal to federally insured savings and loan association of false loan application; considerable mitigating evidence; one year suspension); *In re Silverman,* 80 *N.J.* 489, 404 *A.*2d 301 (1979) (false answers filed with bankruptcy court; admission of guilt, obvious contrition; 18 month suspension); *In re Mocco,* 75 *N.J.* 313, 381 *A.*2d 1212 (1978) (misrepresentation to agencies, but no harm and Respondent not charged with crime; one year suspension). Although counsel for Respondent Pena submitted a post-hearing brief that cited various cases to suggest that a public reprimand or three month suspension should be the maximum penalty, I do not find his authorities analogous or persuasive. *See, e.g., Matter of Eastwood [Eastmond],* 152 *N.J.* 435, 705 *A.*2d 1204 (1998); *Matter of Chalak [Chulak],* 152 *N.J.* 443, 705 *A.*2d 1207 (1998); *Matter of Butler,* 152 *N.J.* 445, 705 *A.*2d 1208 (1998).

These decisions are obviously fact specific and do not reflect a consistent, bright-line approach to discipline. However, they do suggest that the type of dishonesty

involved in this mater [sic], combined with the aggravating factors outlined above and the lack of mitigating factors, requires suspension and not a mere reprimand.

The issue to me is for what period I should recommend suspension and whether the recommendation should vary among the Respondents.

I believe from the evidence adduced that Messrs. Rocca and Pena played the dominant role in this entire transaction vis-a-vis their partner Michael Ahl. However, since Mr. Ahl had to have been a knowing participant in the original fraud and the coverup, and chose not to provide any evidence in mitigation at the hearing, *I cannot justify distinguishing him from his partners.*

The proofs adduced in this matter lead me to conclude that Respondents, having embarked upon their plan, held steadfastly to it through the investigations by the ABC, State Police and City of Hoboken, the pre-trial discovery and trial in the underlying civil litigation and, finally, before this Committee. Therefore, there was a continuing course of conduct that was obviously engaged in deliberately by Respondents to dissemble and misrepresent the true facts to a variety of tribunals.

As a result of the foregoing, I conclude that a multi-year suspension is an appropriate recommendation in light of the fact that the misconduct was not a single, isolated incident, but was a knowing, lengthy, continuing fraud. While from Respondents' standpoint they are obviously placed in the untenable position of having to continue their denials in order to avoid serious consequences, they must also face the consequences of that choice.

[Emphasis added.]

A "multi-year suspension" is, for each respondent, the appropriate discipline in this case, not a scattershot that spares one and fells two.

Justice LONG joins in this opinion.

*For disbarment as to Angel R. Penna, Glenn M. Rocca*—Chief Justice PORITZ and Justices GARIBALDI, COLEMAN and VERNIERO—4.

*For suspension as to Michael S. Ahl*—Chief Justice PORITZ and Justices GARIBALDI, COLEMAN and VERNIERO—4.

*Dissenting as to Angel R. Pena and Glenn M. Rocca*—Justices O'HERN and LONG—2.

## ORDER

It is ORDERED that **ANGEL R. PENA** of **FORT LEE**, who was admitted to the bar of this State in 1984, and who thereafter

was suspended from the practice of law by Order of this Court dated October 22, 1999, and who remains suspended at this time, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **ANGEL R. PENA** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **ANGEL R. PENA** pursuant to *Rule* 1:21–6 shall be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund pending the further Order of this Court; and it is further

ORDERED that **ANGEL R. PENA** comply with *Rule* 1:20–20 governing with disbarred attorneys; and it is further

ORDERED that **ANGEL R. PENA** reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

## ORDER

It is ORDERED that **GLENN M. ROCCA** of **FORT LEE**, who was admitted to the bar of this State in 1983, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **GLENN M. ROCCA** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **GLENN R. ROCCA** pursuant to *Rule* 1:21–6 shall be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the

Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund pending the further Order of this Court; and it is further

ORDERED that **GLENN M. ROCCA** comply with *Rule* 1:20–20 governing disbarred attorneys; and it is further

ORDERED that **GLENN M. ROCCA** reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

## ORDER

It is ORDERED that **MICHAEL S. AHL** of **FORT LEE**, who was admitted to the bar of this State in 1983, is hereby suspended from the practice of law for a period of three years, effective June 5, 2000, and until the further Order of the Court; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20 governing suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.